No. 2014-1693

# In the United States Court of Appeals for the Federal Circuit

———————

SANDOZ INC.,
PLAINTIFF-APPELLANT,

V.

AMGEN INC. AND HOFFMANN-LA ROCHE INC.,
DEFENDANTS-APPELLEES.

———————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA CASE NO. 3:13-CV-02904,
JUDGE MAXINE M. CHESNEY*

———————

**CORRECTED NONCONFIDENTIAL BRIEF OF PLAINTIFF-
APPELLANT SANDOZ INC.**

———————

JAMES F. HURST
MAUREEN L. RURKA
JAMES M. HILMERT
Winston & Strawn LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
jhurst@winston.com

*Counsel for Plaintiff-Appellant
Sandoz Inc.*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................ viii

STATEMENT OF RELATED CASES ................................................................. 1

JURISDICTIONAL STATEMENT .................................................................... 1

STATEMENT OF THE ISSUES ........................................................................ 2

INTRODUCTION .............................................................................................. 3

STATEMENT OF THE CASE ............................................................................ 8

STATEMENT OF FACTS ................................................................................ 10

      A.     Sandoz spends nearly a decade developing a biosimilar version of Amgen's Enbrel®, in reliance on defined patent expiration dates. ................................................................................................. 10

      B.     Amgen acquires submarine patent applications more than two decades after their original filing dates, and claims the granted patents give Amgen the right to exclude Enbrel®'s biosimilar competition. ........................................................................................... 13

      C.     Sandoz brings an action for declaratory judgment, seeking a determination of its rights under Amgen's submarine patents. .......... 16

      D.     The district court dismisses the complaint based on a *sua sponte* construction of the BPCIA. ................................................................. 19

SUMMARY OF THE ARGUMENT ................................................................. 21

STANDARD OF REVIEW .............................................................................. 26

ARGUMENT ................................................................................................... 26

I.     The District Court Erred in Construing the BPCIA to Bar Sandoz's Complaint for Declaratory Judgment. ........................................................ 26

      A.     The district court's *sua sponte* interpretation of the BPCIA is inconsistent with the text of the statute. ............................................. 27

1.      The provisions the district court identified as a jurisdictional bar serve as a prelude to a § 271(e) infringement action, and are not prerequisites to Sandoz's declaratory judgment action...................................................27

2.      The BPCIA's specific limitations on declaratory judgment actions do not apply to Sandoz's complaint............33

        a.      The BPCIA imposes no limitations on a declaratory judgment action filed before a subsection (k) filing.......................................................34

        b.      The district court was not at liberty to apply a jurisdictional bar of its own creation..............................37

3.      Nothing in the BPCIA requires a declaratory judgment action to await FDA approval of the biosimilar product..........39

B.      The district court's statutory construction affirmatively obstructs the purposes of the BPCIA...................................................41

1.      The district court's statutory construction needlessly delays the availability of lower-cost biologic medicines...........41

2.      The district court's construction erroneously deprives Sandoz of any reasonable way to resolve its rights prior to commercial marketing..........................................................44

3.      The district court's statutory construction erroneously manufactures an additional exclusivity period that Congress never intended...........................................................46

II.     The District Court Erred In Concluding There Is No Case or Controversy...............................................................................48

A.      Jurisdiction under the Declaratory Judgment Act extends to the greatest scope allowed by Article III. ...................................................49

B.      The district court's judgment cannot be reconciled with the Supreme Court's decision in *MedImmune*, or this Court's cases applying it...........................................................................51

C.    Amgen's specific patent claims placed Sandoz in the position of either abandoning or pursuing allegedly infringing activity. ..............52

D.    The parties' dispute is sufficiently "real" and "immediate" for adjudication in light of the advanced stage of Sandoz's product development. ....................................................................................56

CONCLUSION .....................................................................................................61

Information Under Protective Order

The material omitted on pages 3, 8, 11, 12, 13, 16, 17, 18, 25, and 54 concerns information that Sandoz Inc. designated as "Confidential Information" under the district court's interim model protective order.  In particular, the information relates to the precise sums of money Sandoz has expended on the development of its etanercept product and details concerning Sandoz's research and development, manufacturing, and launch of its product.

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABB Inc. v. Cooper Indus., LLC,*
    635 F.3d 1345 (Fed. Cir. 2011) .......................................................7, 52

*Aetna Life Ins. Co. v. Haworth,*
    300 U.S. 227 (1937)........................................................................55

*Amgen Inc. v. F. Hoffman-La Roche Ltd.,*
    580 F.3d 1340 (Fed. Cir. 2009) ......................................................60

*Amgen, Inc. v. F. Hoffman-LaRoche Ltd.,*
    456 F. Supp. 2d 267 (D. Mass. 2006)..............................................61

*Arkema Inc. v. Honeywell Int'l, Inc.,*
    706 F.3d 1351 (Fed. Cir. 2013) ................................................passim

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,*
    846 F.2d 731 (Fed. Cir. 1988) .......................................................53

*Benitec Austrl., Ltd. v. Nucleonics, Inc.,*
    495 F.3d 1340 (Fed. Cir. 2007) .....................................................59

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
    132 S. Ct. 1670 (2012)................................................................4, 38

*Caraco Pharm. Labs, Ltd. v. Forest Labs, Inc.,*
    527 F.3d 1278 (Fed. Cir. 2008) .....................................................49

*Cardinal Chem. Co. v. Morton Int'l, Inc.,*
    508 U.S. 83 (1993)....................................................................49, 50

*Cat Tech LLC v. TubeMaster, Inc.,*
    528 F.3d 871 (Fed. Cir. 2008) ....................................57, 58, 59, 60

*Eli Lilly and Co. v. Medtronic, Inc.,*
    496 U.S. 661 (1990)..................................................................30, 33

*Encyclopaedia Britannica, Inc. v. Alpine Elecs. of America, Inc.,*
    609 F.3d 1345 (Fed. Cir. 2010) .....................................................26

*Glaxo, Inc. v. Novopharm, Ltd.*,
110 F.3d 1562 (Fed. Cir. 1997) ...................................................58, 59

*Harris v. Garner*,
216 F.3d 970 (11th Cir. 2000) ...........................................................37

*Lamie v. U.S. Trustee*,
540 U.S. 526 (2004)...........................................................................26

*Lang v. Pac. Marine and Supply Co., Ltd.*,
895 F.2d 761 (Fed. Cir. 1990) .....................................................32, 53

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)...................................................................passim

*Micron Tech. Inc. v. Mosaid Techs., Inc.*,
518 F.3d 897 (Fed. Cir. 2008) .............................................6, 45, 50

*Newport News Shipbuilding and Dry Dock Co. v. Garrett*,
6 F.3d 1547 (Fed. Cir. 1993) ..............................................................38

*Prasco, LLC v. Medicis Pharm. Corp.*,
537 F.3d 1329 (Fed. Cir. 2008) ..........................................................54

*SanDisk Corp. v. STMicroelectronics, Inc.*,
480 F.3d 1372 (Fed. Cir. 2007) ...................................................passim

*Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*,
497 F.3d 1271 (Fed. Cir. 2007) .....................................................52, 55

*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*,
982 F.2d 1520 (Fed. Cir. 1992) ..........................................................59

*Terry v. Principi*,
340 F.3d 1378 (Fed. Cir. 2003) ..........................................................26

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,
482 F.3d 1330 (Fed. Cir. 2007) ...................................................passim

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am. Inc.*,
508 U.S. 439 (1993)...........................................................................27

**STATUTES**

28 U.S.C. § 2201 ...................................................................................passim

35 U.S.C. § 271(a) ........................................................................................32

35 U.S.C. § 271(e) ..................................................................................passim

35 U.S.C. § 271(e)(2)(C)(i) .........................................................................29

35 U.S.C. § 271(e)(2)(c)(ii) .........................................................................29

42 U.S.C. § 262(a) ........................................................................................38

42 U.S.C. § 262(k)(7).................................................................10, 12, 15, 31

42 U.S.C. § 262(k)(7)(A) .......................................................................30, 46

42 U.S.C. § 262(k)(7)(B) .............................................................................30

42 U.S.C. § 262(l)(1)-(2) .............................................................................28

42 U.S.C. § 262(l)(2)(A) ..............................................................................36

42 U.S.C. § 262(l)(3)(A) ..............................................................................28

42 U.S.C. § 262(l)(3)(B) ..............................................................................28

42 U.S.C. § 262(l)(3)(C) ..............................................................................28

42 U.S.C. § 262(l)(4)(A) ..............................................................................29

42 U.S.C. § 262(l)(5)(A) .........................................................................29, 34

42 U.S.C. § 262(l)(5)(B) ..............................................................................29

42 U.S.C. § 262(l)(7) ....................................................................................36

42 U.S.C. § 262(l)(8)(A) .........................................................................31, 40

42 U.S.C. § 262(l)(8)(B) ..............................................................................35

42 U.S.C. § 262(l)(9)(A) ........................................................................5, 29, 34

42 U.S.C. § 262(l)(9)(A)-(C) .......................................................................22

42 U.S.C. § 262(l)(9)(B) ........................................................................35

42 U.S.C. § 262(l)(9)(B)-(C) ......................................................32, 36, 37

42 U.S.C. § 262(l)(9)(C) .........................................................................36

42 U.S.C. § 262(m)(2)(a) .........................................................................47

42 U.S.C. § 262(m)(3)(a) .........................................................................47

42 U.S.C. § 271(e)(2)(C) ....................................................................5, 33

**OTHER AUTHORITIES**

*Biologics and Biosimilars: Balancing Incentives for Innovation*, *Hearing*
    *Before the Subcomm. On Courts and Competition Policy of the H. Comm.*
    *on the Judiciary*, 111th Cong. 46 (July 14, 2009) .......................................43, 44

H.R. 3590-686, 111th Cong. § 7001(a)-(b) (2009-2010) .......................................41

Krista H. Carver et al., *An Unofficial Legislative History of the Biologics*
    *Price Competition and Innovation Act of 2009*, 65 FOOD AND DRUG L.J.
    671 (2010) .................................................................................43, 44

# CERTIFICATE OF INTEREST

Pursuant to Circuit Rule 47.4, undersigned counsel for Plaintiff-Appellant

Sandoz Inc., certifies the following:

1.      The full name of every party or amicus represented by us is:

Sandoz Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

Not applicable; the party named in the caption is the real party in interest.

3.      All parent corporations and any publicly held companies that own 10% or more of the stock of any party represented by us are:

Novartis AG, the ultimate parent company of Sandoz Inc., owning 100 percent of Sandoz Inc., and trading on the New York Stock Exchange under the ticker symbol NVS.

4.      The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or expected to appear in this court are:

Winston & Strawn LLP (James F. Hurst, Maureen L. Rurka, James M. Hilmert, Merritt D. Westcott, Elizabeth J. Thompson, Ian J. Nomura, Melinda K. Lackey, K. Joon Oh).

Dated:  March 14, 2014                    /s/ James F. Hurst
                                          JAMES F. HURST

                                          *Counsel for Plaintiff-Appellant*
                                          *Sandoz Inc.*

## STATEMENT OF RELATED CASES

No appeal in this case was previously before this Court or any other appellate court. Counsel for Sandoz is not aware of any other cases that would directly affect or be directly affected by the Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. It entered a final judgment on November 19, 2013, A6, which Sandoz timely appealed, A1681-82. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Did the district court err in dismissing Sandoz's complaint for declaratory judgment based on a *sua sponte* construction of the Biologics Price Competition and Innovation Act, which (a) cannot be reconciled with the specific language of the statute, (b) makes a declaratory judgment action essentially useless for resolving patent disputes involving biosimilar drug products, and (c) threatens to create a six-month period of additional marketing exclusivity for all reference biologic products that Congress never envisioned in drafting the statute?

2.    Did the district court erroneously conclude that it lacked subject matter jurisdiction over this patent dispute simply because Amgen has not specifically threatened to sue Sandoz, where Amgen has instead publicly proclaimed—repeatedly—that it would use its long-concealed submarine patents to block any competition for over a decade beyond Sandoz's anticipated launch date, and where this Court has pointedly held that "a specific threat of infringement litigation by the patentee is not required to establish jurisdiction"?

## INTRODUCTION

This is precisely the kind of case Congress envisioned when enacting the Declaratory Judgment Act. For nearly a decade, Sandoz developed a biosimilar version of Enbrel® with the legitimate expectation that Amgen's patents allegedly covering that drug—first issued nearly twenty years ago—would have expired by the time of Sandoz's planned [REDACTED] product launch. Yet, just as Amgen's patents were expiring and Sandoz's product development was concluding, Amgen suddenly proclaimed that the PTO had issued two brand new patents, based on submarine applications, giving it the right to exclude all biosimilar competition to Enbrel® until 2029.

Amgen's claims to long-term patent exclusivity upended Sandoz's settled expectations, cast a specter over Sandoz's plans for a product it had already spent [REDACTED] developing, and threatened to nullify further investments in that product. Amgen's claims also forced Sandoz to potentially shelve its product pending resolution of a patent dispute or risk possibly catastrophic liability by launching to compete in the $4.1 billion annual market for Enbrel®. A2055 (¶ 15). To obtain relief from this uncertainty, Sandoz filed a lawsuit seeking a declaration that its product does not infringe the submarine patents and that they are invalid and unenforceable.

Although Sandoz's complaint identified precisely the type of circumstance the Declaratory Judgment Act exists to remedy, in a cursory four-page order, the district court dismissed the complaint. The district court held, *sua sponte*, that the Biologics Price Competition and Innovation Act ("BPCIA") completely deprives federal courts of jurisdiction over any declaratory judgment action implicating a biosimilar product until after the FDA had already approved the product—a serious error that undermines the BPCIA's stated purpose of advancing competition for biologic drugs. The court also believed it lacked jurisdiction because Amgen did not specifically threaten to sue Sandoz for infringement—a conclusion directly contrary to the Supreme Court's holding in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128, 137 (2007), which it did not cite.

**BPCIA Ruling:** The Supreme Court has held that it is error to "interpret statutes as creating a jurisdictional bar when they are not framed as such." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1680 n.5 (2012) (quoting *Stern v. Marshall*, 131 S. Ct. 2594, 2607, 180 L. Ed. 2d 475 (2011)). Yet, that is exactly what happened here. Nothing in the BPCIA addresses, much less bars, jurisdiction under the current circumstances.

The district court's contrary ruling defies both the plain text and very purpose of the BPCIA. The BPCIA contains no provision depriving courts of jurisdiction to resolve patent disputes where jurisdiction already existed, as here,

before an FDA filing.  While the BPCIA does contain certain limitations on declaratory judgment actions *after* a biosimilar application is submitted, those limitations do not apply to Sandoz's complaint, which was filed *before* any FDA application.  The district court was not at liberty to impose a jurisdictional bar that does not exist in the statute's text, and its decision to create such a bar—without briefing on the issue, no less—was pure error.

The district court compounded this error by misinterpreting the BPCIA's provisions.  According to the district court, "neither a reference product sponsor, such as Amgen, nor an applicant, such as Sandoz, may file a lawsuit *unless and until* they have engaged in a series of statutorily-mandated exchanges of information."  A3 (emphasis added).  But those patent exchanges serve only as a prelude for an action for a patent owner's *infringement* lawsuit under § 271(e)(2)(C), not a declaratory judgment.  The statute allows either party to file for declaratory judgment once a biosimilar applicant gives notice of its intention to market its product.  42 U.S.C. § 262(l)(9)(A).  Thus, even if the BPCIA applied, as the district court found, its provisions would expressly *permit* Sandoz's action here because Sandoz provided Amgen notice of its intention to commercially market its product before bringing this case.  A1556-57.

Nevertheless, the district court sweepingly barred declaratory jurisdiction until after biosimilar product approval, because it concluded a biosimilar company

cannot provide notice of its commercial marketing until *after* the FDA approves the biosimilar product. A3-4. The BPCIA says no such thing, and the court's conclusion makes no practical sense. The whole point of a declaratory judgment action is "to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Micron Tech. Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 902 (Fed. Cir. 2008) (citation omitted). By delaying a declaratory judgment proceeding until after product approval, the district court rendered the procedure useless for determining patent rights before biosimilar market entry—contrary to its purpose under the BPCIA.

The district court's judgment also seriously disrupts the exclusivity structure of the BPCIA. According to the statute, the biosimilar applicant must give at least six months' notice before launching its product. If a biosimilar applicant is forbidden from providing this notice before its approval—as the district court now holds—then applicants will be forbidden from launching biosimilar products until six months *after* obtaining final FDA authority to do so, in all cases, and regardless of any existing patent coverage or the expiry of the 12-year data exclusivity period. The court's erroneous construction thereby guarantees every biosimilar product must uselessly wait to launch for six months *after* the FDA provides formal approval to launch, creating an extra-statutory period of product exclusivity that

Congress never intended in drafting the BPCIA.  For all of these reasons, the district court's statutory construction was error and should be vacated.

**Article III Ruling:** The district court equally erred in concluding that it lacked jurisdiction under Article III of the Constitution.  Principally, the district court concluded that there was no "case or controversy" because Amgen did not specifically threaten to sue Sandoz or cause it "imminent" injury.  A4.  However, the Supreme Court held in *MedImmune* that jurisdiction did not require a specific threat to sue, 549 U.S. at 128, 137, and this Court has held likewise.  *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1348 (Fed. Cir. 2011) ("[A] specific threat of infringement litigation by the patentee is *not required* to establish jurisdiction.") (emphasis added).  The district court's judgment cannot stand under this controlling precedent, which the court did not cite or otherwise acknowledge.

On the facts here, there was clearly jurisdiction over Sandoz's complaint.  A "controversy" exists for purposes of a declaratory judgment action "where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do."  *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007).  Here, Amgen voluntarily and for its own benefit took an express position that its submarine patents cover the protein in Enbrel® and will exclude any biosimilar competition, including Sandoz's product, for another 15 years.

The effect of Amgen's public patent position—and likely its intent—was to place its competitors' products under a cloud of alleged infringement and to deter future investment in them.  Because Amgen claims exclusivity against Sandoz's product until 2029, any future investment, including a planned REDACTED expansion of Sandoz's manufacturing facilities, is potentially wasted.  Under such circumstances, particularly where the patent claims arose unexpectedly and disrupted nearly a decade of product development, denying Sandoz the ability to seek resolution of its rights is inequitable and contrary to the objectives the Declaratory Judgment Act exists to serve.

The district court erred as a matter of law in dismissing Sandoz's complaint, which identified a real and immediate controversy between the parties amenable to judicial resolution.  The judgment should be reversed and the case remanded for further proceedings.

## STATEMENT OF THE CASE

On November 22, 2011, the PTO issued U.S. Patent No. 8,063,182, based on an unpublished application claiming priority to applications filed before 1990.  A25.  Five months later, the PTO issued U.S. Patent No. 8,163,522, which claims priority to the same applications.  A58.  Thereafter, Amgen made numerous public claims in industry conferences, investor conferences, and securities filings that the newly issued patents allowed it to exclude all biosimilar competition to Enbrel®

until 2029.  A1442; A1448; A1473; A1484; A1492; A1504.  Following these public claims, on June 24, 2013, Sandoz filed a complaint against Amgen (the exclusive licensee) and Roche (the assignee) seeking a declaration that Sandoz did not infringe the '182 and '522 patents, and that they were invalid and unenforceable.  A2001-19.

On August 16, 2013, Amgen and Roche (collectively "Amgen") moved to dismiss for lack of subject matter jurisdiction.  Amgen based its motion on what it characterized as a "factual" attack.  *See* A1001-29.  Mainly, Amgen speculated that it was possible Sandoz's product would change or fail, and thus, the dispute was not sufficiently real or immediate for declaratory judgment jurisdiction.  A1006-09; A1014-19.  Amgen never suggested that the BPCIA presented a jurisdictional bar to Sandoz's complaint.  Rather, Amgen's sole mention of the BPCIA came in the final two paragraphs of its opening brief, when it urged the district court to exercise its *discretion* to dismiss the case pending an FDA filing.  A1027-28.  Sandoz responded accordingly.  A2046-49.

On November 12, 2013, the district court entered an order dismissing Sandoz's complaint, holding the BPCIA acted as a jurisdictional bar.  A1-5.  Although the district court attributed that argument to Amgen, A2, the district court reached that conclusion all by itself, without seeking any briefing or input from the parties on that issue.  The court made no factual findings on the

jurisdictional issues of "immediacy" or "reality" upon which Amgen based its factual attack, nor did the court address any of the arguments that Sandoz had made in its papers supporting jurisdiction. *See* A1-5.

The district court entered judgment on November 19, 2013, and this appeal followed.

## STATEMENT OF FACTS

### A. Sandoz spends nearly a decade developing a biosimilar version of Amgen's Enbrel®, in reliance on defined patent expiration dates.

Enbrel® is a widely used biologic drug approved by the FDA for the treatment of inflammatory conditions. A1218; A1228. Its active ingredient, a protein called etanercept, reduces inflammation by binding to tumor necrosis factor ("TNF"). A1218-20. Amgen's predecessor developed Enbrel® in the early 1990s, and the FDA first approved it in 1998 for the treatment of rheumatoid arthritis. A2004-05 (¶ 14). In 2012, Enbrel® was Amgen's second-largest product, accounting for 25% of its annual revenues and over $4 billion in U.S. sales. A1136-37; A1188. Because Enbrel® was FDA-approved in 1998, the 12-year exclusivity period for Enbrel® under the BPCIA expired in 2010. *See* 42 U.S.C. § 262(k)(7). Thus, there is no statutory bar to the approval of a biosimilar version of Enbrel®.

Sandoz began work on its etanercept product in 2004, and has developed it continuously since that time. A2052-54 (¶¶ 2-10). Sandoz proceeded with the

assumption that its product's first commercial marketing would coincide with, or post-date, the expiration of potentially relevant patent rights, including U.S. Patent Nos. 5,395,760 and 5,605,690—both of which Amgen listed on the package insert for Enbrel®, and which expired in 2012 and 2014, respectively.  A2055 (¶ 16). For nearly a decade, Sandoz expended substantial time and effort with the expectation of being able to market its product in ███.  The total development costs, through the conclusion of its Phase III trial, are expected to be more than ███. ███.  A2054 (¶ 11).

Sandoz's work involved creating a cell line focusing on comparable quality attributes to Enbrel®, developing a manufacturing process and a suitable formulation of the drug, proving virtual identity with Enbrel® on a molecular and functional basis, developing a pre-filled syringe drug product, and transferring its processes to large-scale production for clinical trials.  A2052-55 (¶¶ 2-13). Working closely with the FDA, Sandoz has tested its product in several animal models, in a Phase I clinical trial with healthy human volunteers, and now in an ongoing Phase III clinical trial.  A2008-09 (¶¶ 39, 41-42); A2053-54 (¶¶ 6, 9-10).

After nine years of systematic efforts, Sandoz has a final etanercept product. A2054 (¶ 7).  Sandoz's and Amgen's products are exactly the same for all practical purposes.  Sandoz has directly compared its etanercept product to Enbrel® on a molecular and functional basis, showing it has the same primary amino acid

CONFIDENTIAL INFORMATION OMITTED FROM THIS PAGE

sequence as Enbrel®, the same secondary and tertiary protein structures, and that it is essentially indistinguishable in a wide array of molecular and biological tests. A2052 (¶ 5).  In the Phase I clinical trials, Sandoz tested the pharmacokinetics of its product in 54 human volunteers as compared to U.S.-sourced Enbrel®.  A2060-61 (¶ 9).  The study showed Sandoz's etanercept was bioequivalent to Enbrel® in its pharmacokinetics and showed a similar safety profile.  *Id.*

REDACTED

The current Phase III trial is the final stage in the development of Sandoz's etanercept product.  A2061  (¶ 10).  This study, intended to support both U.S. approval and European registration, tests the safety and efficacy of etanercept in a large population of patients suffering from plaque psoriasis, as compared to Enbrel®.  *Id.*

While Amgen speculated that Sandoz's Phase III clinical trial might fail in some unspecified way, A1015-16, there is no reason to believe that will happen.

Enbrel® has been shown to work in treating psoriasis. A2061-62 (¶ 14). Sandoz's etanercept is essentially indistinguishable from Enbrel® on a molecular and functional basis and bioequivalent to Enbrel® in pharmacokinetics. A2053 (¶ 5). The same dosage form, method of administration, and strength of etanercept are being tested in Sandoz's ongoing trial. A2061 (¶ 14). Thus, the Phase III trial is a mere *confirmation* that Sandoz's etanercept product is essentially identical to Enbrel®, as Sandoz already demonstrated in earlier studies. Given the already-established identity between Sandoz's product and Enbrel®, there is no good scientific basis for expecting anything other than that the confirmatory trial will prove successful. A2060-62 (¶¶ 7-8, 10, 14-15).

Following the conclusion of its Phase III clinical trial, Sandoz will submit an application seeking FDA approval. Thereafter, Sandoz expects FDA approval by REDACTED, when it intends to launch its product. A2062-63 (¶ 18); A2055 (¶ 14).

**B.    Amgen acquires submarine patent applications more than two decades after their original filing dates, and claims the granted patents give Amgen the right to exclude Enbrel®'s biosimilar competition.**

Ever since its approval in 1998, and before, Amgen and its predecessor Immunex have claimed that Enbrel® is protected by U.S. patents. A2005 (¶ 15). Among other patents, Immunex acquired the '760 patent in 1995 and the '690 patent in 1997. A1242. Based on these patents alone, Amgen has enjoyed

exclusivity over Enbrel® for fifteen years.  However, the '760 patent expired in

2012, and the '690 patent expired in February 2014.  A2005 (¶ 19).

Faced with the expiration of patent protection over its franchise drug,

Amgen licensed rights in two patent applications from Roche, filed in 1995, and

claiming priority to applications filed in 1990 and before.  A1357; A25-103.  In

2005, Amgen took over their prosecution and sought to use them as vehicles to

obtain additional patents putatively covering etanercept to extend its market

exclusivity.  A2005-07 (¶¶ 21-23, 28-33); A1350-55.  The applications were

unpublished and unavailable to the public.  Sandoz had no reason to suspect they

even existed, let alone what they were claiming.  *See* A2002-03 (¶¶ 2, 5); A2007

(¶ 35); A2014 (¶ 71); A2055 (¶ 16).

On November 22, 2011, just as the '760 patent was expiring, Amgen issued

a press release proclaiming that it had acquired U.S. Patent No. 8,063,182.  A1356-

59.  Amgen announced that "[t]he patent describes and claims the fusion protein

that is etanercept, and by statute, the '182 patent has a term of 17 years from

today"—until November 2028.  A1356.  Five months later, on April 24, 2012, the

Patent Office issued U.S. Patent No. 8,163,522, based on the other submarine

application.  A58-104.  Amgen claimed that the '522 patent, like the '182 patent, is

"material" to its Enbrel® product.  A1080.  According to Amgen, the term of the

'522 patent is set to expire April 24, 2029—over 39 years after its original application was filed and 31 years after Enbrel® was approved.  *Id.*

Following the issuance of its patents, Amgen trumpeted its newfound "exclusivity" against all biosimilar competition.  For the '182 patent, Amgen announced "[t]his newly issued patent to the fusion protein that is etanercept adds to [existing] patent protection," "[w]e are confident in our ability to protect our products," and thus, "we do not envision Enbrel biosimilar competition in the United States for the foreseeable future."  A1442.

At an industry conference attended by its potential biosimilar competitors, Amgen proclaimed: "with a broad patent estate that we have now established for Enbrel, we feel that the market exclusivity for Enbrel is going to be prolonged and we don't anticipate any biosimilar competition in the foreseeable future."  A1448.  Amgen sounded the same refrain over and over throughout 2012 and 2013.  A1473; A1484; A1504; A1492 ("Given this added exclusivity that we now have on Enbrel, we are not expecting any biosimilar competition for Enbrel in the foreseeable future.").

Amgen was already notorious for its aggressive patent enforcement actions.  It had previously sued competitors planning to market competing versions of its EPO product, by seeking a declaration of *future* infringement before any FDA filings were made.  A1063-65 (¶¶ 27-31); A1547-52 (¶¶ 35-40).  In 2012, while it

was boasting about its new Enbrel® patents, Amgen's CEO stated: "we have

consistently demonstrated that we have the will and the skill to defend our

intellectual property, and you should expect that we'll do that with respect to our

G-CSF franchise as well as our other franchises."  A1528.  Further, he warned:

"you should expect that we will assert our IP rights, and to the extent that they

infringe, you should expect that we'll deal with that through the appropriate

channel."  A1528; A2013 (¶ 63).

Amgen's message was clear:   The '182 and '522 patents cover Enbrel®,

Amgen will not tolerate biosimilar competition, and it will enforce the '182 and

'522 patents to protect its market exclusivity.

### C.    Sandoz brings an action for declaratory judgment, seeking a determination of its rights under Amgen's submarine patents.

Amgen's new patent position disrupted Sandoz's business.  Sandoz had

allocated nine years of product development and ███ REDACTED ███, only to

have Amgen suddenly claim the right to exclude its product for an entire

generation based on submarine patents issuing decades after their original filing

dates, which Sandoz had no way of knowing about.  A2002-03 (¶¶ 3-5); A2055-56

(¶¶ 16-20).  Sandoz, however, has no intention of abandoning its product in the

face of Amgen's claims.  It believes the patents are invalid for multiple reasons,

unenforceable, and not infringed.  A2002 (¶ 4); A2006 (¶¶ 26-27); A2007 (¶ 34);

A2015-18 (¶¶ 73-108).

Amgen's patent claims place Sandoz in an untenable situation.  In order to meet the expected commercial demand for its product, Sandoz requires further immediate investment in its product, including REDACTED expansion of manufacturing facilities.  A2009 (¶ 43); A2055 (¶ 14).  This investment—which is directed principally towards meeting U.S. commercialization forecasts—would be largely wasted if Amgen were to later prevail on its infringement claims.  Sandoz is thus faced with the present decision of proceeding with activities directed towards allegedly infringing activity or abandoning them.  A2056 (¶ 19).

There is no hope of Sandoz obtaining a license from Amgen.  Amgen has repeatedly stated it intends to exclude biosimilar competition for Enbrel®; indeed, its whole business model is premised on enforcing its patents against competing products.  *See, e.g.*, A1528.  Amgen has grown its Enbrel® sales into 25% of its company's total through price increases that would be impossible with biosimilar competition.  A2010 (¶ 48); A1080; A1136-37.  The '182 and '522 patents are critical to Amgen's long-term strategy for Enbrel®, which stands to be even more profitable for Amgen following the 2013 expiration of a co-promotion agreement with Pfizer.  A2010-11 (¶ 49); A1080; A1448; A1473-74; A1484.  Licensing the patents to Sandoz would be contrary to Amgen's entire business plan for Enbrel®.  *See, e.g.*, A1484; A1528; A1118-19.

CONFIDENTIAL INFORMATION OMITTED FROM THIS PAGE

To obtain relief from the uncertainty caused by Amgen's new patent position, Sandoz filed a complaint in the U.S. District Court for the Northern District of California, seeking a declaration that the '182 and '522 patents are invalid, unenforceable, and would not be infringed by the commercial marketing of Sandoz's etanercept product.  A2001-19.

The timing of Sandoz's complaint was intended to ensure prompt resolution of its rights while taking into account the jurisdictional requirements of "reality" and "immediacy."  By filing its complaint in 2013, Sandoz sought to ensure sufficient time for the litigation so that it would be able to obtain a final district court judgment before its intended commercial marketing, anticipated in REDACTED.  At the time it filed the complaint, Sandoz had finalized its formulation, REDACTED shown biochemical similarity to Enbrel®, successfully completed a head-to-head clinical trial, initiated a final confirmatory clinical trial, and REDACTED A2053-55 (¶¶ 5-7, 12-14); A2060-61 (¶¶ 8-10, 12); A2062-63 (¶¶ 16-18).

Prior to filing its complaint, Sandoz wrote Amgen, providing notice of its intention to commercially launch its product upon FDA approval, and requesting a covenant not to sue under the '182 and '522 patents.  A2014 (¶ 68); A1555-57. Amgen and Roche never responded to Sandoz's letter, and in the proceedings

below, Amgen confirmed its intent to sue Sandoz in the future—only on its own timetable. *See* A1006-10.

### D. The district court dismisses the complaint based on a *sua sponte* construction of the BPCIA.

Below, Amgen made a factual attack on jurisdiction, claiming that Sandoz's product was not sufficiently real or immediate to support the issuance of a declaratory judgment. A1014-26. The parties briefed that issue extensively and took discovery on it. *See* A2020-50; A2064-75; A1595-19. After Amgen filed an expert report with its reply brief, the district court permitted Sandoz the opportunity to file a surreply to address the arguments raised therein. A20 (D.I. 85).

In its four-page order dismissing Sandoz's complaint, however, the district court made no findings about any disputed "factual" issue, and largely disregarded both party's arguments. Instead, the district court resolved the case by interpreting the BPCIA to bar Sandoz's complaint—an argument that Amgen had not even raised in its opening brief, and to which Sandoz had no reason nor meaningful opportunity to respond. *See* A2-5.

The district court did not identify any provision in the BPCIA that bars potential biosimilar applicants from filing declaratory judgment actions. Rather, without explaining how the specific text of the statute could apply to Sandoz's complaint, the district court sweepingly held that the BPCIA's default provisions

-19-

for patent exchanges are jurisdictional prerequisites that must be completed before *any* party can file *any* action, including for declaratory judgment (with "limited exceptions" that the court did not specify). A3-4.

The district court went even further. The district court recognized that the BPCIA specifically *allows* declaratory judgment actions after a biosimilar applicant provides notice of commercial marketing. A3. But it held, without identifying any express statutory provision saying as much, that notice of commercialization can only be provided *after* the FDA has given final approval to the biosimilar applicant to market its product. *Id*. The district court thus held that the BPCIA prohibits any complaint for declaratory judgment from being filed until *after* the FDA has already approved the biosimilar product, thereby threatening to create an additional six-month period of exclusivity for every reference biologic medicine—something Congress neither contemplated nor debated.

Alternatively, the district court held that subject matter jurisdiction required Amgen to make an explicit threat to sue Sandoz for infringement. A3-4. Even though Amgen had taken a specific public position under its patents, and told the public that it intended to "exclude" any biosimilar applicant based on those patents, the district court held that "such statements do not suffice to show an 'imminent threat'" of litigation. A4. In so holding, the district court disregarded the Supreme

Court's *Medimmune* decision, and declined to discuss any of the other cases Sandoz cited from this Court applying *MedImmune*.

Through this procedure, the district court thereby issued a statutory construction of first impression, and denied Sandoz access to the federal courts to resolve its rights under Amgen's submarine patents.

## SUMMARY OF THE ARGUMENT

The district court fundamentally erred by interpreting the BPCIA as a jurisdictional bar to Sandoz's complaint and by holding there was no "case or controversy" for judicial resolution.

**I.**    Contrary to the district court's conclusion, the BPCIA does not forbid a declaratory judgment action until after the FDA approves the biosimilar product. By interpreting the statute in such a way, the district court arrived at a construction that defies the express provisions of the statute and fundamentally conflicts with its key purpose in advancing price competition in biologic medicines.

**A.**    The district court's imposition of a jurisdictional bar is inconsistent with the text of the BPCIA in three different ways.

***First***, the patent-exchange provisions the district court identified as being a jurisdictional bar relate to the reference product sponsor's optional lawsuit for actual *patent infringement* under 35 U.S.C. § 271(e) *after* the filing of a biosimilar application.  The BPCIA does not make those exchanges a jurisdictional

-21-

prerequisite to an action for *declaratory judgment* under 28 U.S.C. § 2201, which serves a completely different function from a § 271(e) infringement action in the context of the statute.  The BPCIA's § 271(e) action was designed particularly for situations where a biosimilar application was filed four years after the reference product was approved, during an extended period of time for exclusivity for the reference product.  A declaratory judgment is appropriate in cases where, like here, no exclusivity remains for the reference product and the biosimilar product is eligible for immediate commercial marketing upon approval.

*Second*, nothing in the BPCIA purports to bar a declaratory judgment action brought to resolve a patent disputes before filing a biosimilar application.  The BPCIA's only limitations on declaratory judgments are set forth in three specific paragraphs, which the district court largely disregarded, and which do not apply before filing a biosimilar application.  42 U.S.C. § 262(l)(9)(A)-(C).  Even assuming they could apply at all, none of these provisions would bar Sandoz's complaint, since Sandoz has already provided notice of commercial marketing (paragraph (9)(A)), and has not "failed" to comply with any statutory duties (paragraphs (9)(B) and (9)(C)).  In the absence of any express bar to jurisdiction, it was error for the district court to impose one of its own creation.

*Third*, nothing in the text of the BPCIA requires a declaratory judgment action to be delayed until *after* the biosimilar product is approved.  The district

court reached that conclusion entirely by misinterpreting a single phrase of the statute, which indicates a biosimilar product must be "licensed under subsection (k)" before it can be sold.  Nothing in that phrase or any other in the BPCIA requires the biosimilar applicant to wait for approval before providing *notice* of its intended commercial marketing.

**B.**    The district court gave no explanation for why it makes any sense to delay a declaratory judgment action until after the FDA has approved a biosimilar application.  It does not.  The district court's holding is contrary to the whole point of a declaratory judgment action, which exists to relieve an accused infringer from harm caused by a *delay in adjudicating its rights*.  Indeed, given the practicalities of how long federal court litigation takes, the district court's judgment ensures that patent disputes will not be resolved until *years* after FDA approval.

Because companies will not launch biosimilar products with billion-dollar damages claims outstanding, the district court's judgment affirmatively obstructs the BPCIA's central purpose in encouraging price competition in biologic drugs, ensuring that the public will be deprived of lower-cost biosimilar drugs for years simply due to the delay in resolving patent disputes.  Further, the judgment creates a completely unjustified, extra-statutory six-month period of exclusivity for the reference product sponsor, above and beyond the carefully negotiated, 12-year period set forth in the statute—further delaying biosimilar competition for all

currently approved reference products in a manner completely inconsistent with Congress' policy judgment.

The district court's holding means Sandoz's etanercept product will needlessly exist under a cloud of infringement allegations for years, where otherwise Sandoz could have obtained clarity of its rights in a timely manner. The district court's judgment thus ensures Sandoz's product launch will come at the risk of potentially catastrophic liability under Amgen's submarine patent claims. Because that result is inconsistent with both the text and purpose of the BPCIA—and the rationale for the Declaratory Judgment Act itself—the district court's statutory interpretation should be vacated.

**II.**    The district court equally erred in concluding that Sandoz's complaint did not present a case or controversy under Article III of the Constitution. The district court's analysis of that issue, consisting of two short paragraphs of legal conclusions, is entirely contrary to law.

**A.**    First, the district court held that Amgen needed to specifically threaten an infringement lawsuit or otherwise cause "imminent" harm to Sandoz before declaratory jurisdiction could exist. That conclusion is exactly contrary to the Supreme Court's opinion in *Medimmune* and numerous decisions of this Court applying *Medimmune*—none of which the district court acknowledged in dismissing the case.

Contrary to the district court's mistaken belief, a justiciable case and controversy exists, under the totality of the circumstances, where a patent holder "takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." *SanDisk*, 480 F.3d at 1381. That is precisely what has occurred here. Amgen expressly, specifically, and publicly claimed its submarine patents cover "the fusion protein that is etanercept"—the very product Sandoz has developed for nearly a decade. *See* A1357; A1442; A1448; A1464; A1473; A1484; A1504; A1492. Sandoz disputed that claim, A1556-57, and brought this lawsuit to resolve that dispute.

Without the ability to obtain resolution of its rights under Amgen's patent claims, Sandoz will suffer precisely the harm that the Declaratory Judgment Act was designed to remedy. Amgen's claims threaten to moot over REDACTED in development costs, another REDACTED in future investments directed towards U.S. commercialization, and will require Sandoz to "hav[e] to act at [its] peril … or abandon [its] rights because of a fear of incurring damages"—the "quintessential example of a situation in which declaratory relief is warranted." *Arkema Inc. v. Honeywell Int'l, Inc.*, 706 F.3d 1351, 1356-57 (Fed. Cir. 2013) (citation omitted).

**B.** Second, the district court seems to have believed that jurisdiction could only exist after Sandoz makes an FDA filing. The law does not support such

a rigid rule.  On the contrary, this Court has held that a dispute need only be sufficiently real and immediate to "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts."  *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1339 (Fed. Cir. 2007) (quoting *Medimmune*).  Here, Sandoz submitted detailed affidavits showing that it engaged in nearly a decade of "substantial preparation," and has a final product that is fixed and cannot change in any way that is relevant to the patents at issue here.  The district court made no contrary findings, and erred as a matter of law in holding that no case or controversy exists.

## STANDARD OF REVIEW

A district court's statutory construction is a pure issue of law, which this Court reviews *de novo.  Encyclopaedia Britannica, Inc. v. Alpine Elecs. of America, Inc.*, 609 F.3d 1345, 1349 (Fed. Cir. 2010).  The existence of subject matter jurisdiction is also reviewed *de novo.  Arkema*, 706 F.3d at 1356.

## ARGUMENT

### I.     The District Court Erred in Construing the BPCIA to Bar Sandoz's Complaint for Declaratory Judgment.

A correct statutory interpretation is faithful to the plain meaning of the statute's particular language.  *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004).  It makes sense in "the setting of the statutory scheme of which it is a part."  *Terry v.*

*Principi*, 340 F.3d 1378, 1385 (Fed. Cir. 2003).  And it is consistent with the

"object and policy" of the statute as a whole.  *U.S. Nat'l Bank of Oregon v. Indep.*

*Ins. Agents of Am. Inc.*, 508 U.S. 439, 455 (1993) (citation omitted).  The district

court's construction of the BPCIA has none of these characteristics, and is clearly

incorrect.

A.    **The district court's *sua sponte* interpretation of the BPCIA is inconsistent with the text of the statute.**

The district court found a jurisdictional bar to Sandoz's complaint based not

on any particular statutory language, but based on an erroneous paraphrasing of the

statute that is inconsistent with the very provisions it purported to interpret.  The

supposedly "mandatory" provisions the district court cited apply to § 271(e)

*infringement* actions, and none of the BPCIA's specific limitations on *declaratory*

*judgments* apply by their terms.  In the absence of a textual basis for a

jurisdictional bar, it was error for the district court to create one.

1.    **The provisions the district court identified as a jurisdictional bar serve as a prelude to a § 271(e) infringement action, and are not prerequisites to Sandoz's declaratory judgment action.**

According to the district court, "neither a reference product sponsor, such as

Amgen, nor an applicant, such as Sandoz, may file a lawsuit *unless and until* they

have engaged in a series of statutorily-mandated exchanges of information."  A3

(emphasis added).  As its basis for that sweeping conclusion, the district court cited

the BPCIA's provisions for a series of exchanges of information between the reference product sponsor and the biosimilar applicant prior to an infringement action. A3 (citing 42 U.S.C. §§ 262(l)(2)-(6)). However, those exchanges of information serve as a prelude to a reference product sponsor's *infringement action* under 35 U.S.C. § 271(e); they are not prerequisites for a declaratory judgment action brought under 28 U.S.C. § 2201.

The BPCIA's text differentiates between the roles these different types of claims play in the overall statutory scheme. To set the stage for a § 271(e) infringement action, the BPCIA provides that the biosimilar applicant and reference product sponsor can elect to engage in a series of private information exchanges after the biosimilar application is filed. The biosimilar applicant first confidentially discloses its FDA application to the reference product sponsor, 42 U.S.C. § 262(l)(1)-(2), who then provides a list of patents it believes could be asserted against the product described in the application, 42 U.S.C. § 262(l)(3)(A). The biosimilar applicant provides its own list of relevant patents, along with a description of why its product would not infringe any of the patents, or why they are invalid or unenforceable. 42 U.S.C. § 262(l)(3)(B). The reference product sponsor then responds to the biosimilar applicants' contentions. 42 U.S.C. § 262(l)(3)(C).

After exchanging their respective viewpoints, the reference product sponsor and biosimilar applicant negotiate about which patents should be subject to a § 271(e) infringement action. 42 U.S.C. § 262(l)(4)(A). If they cannot agree on a list, the BPCIA biosimilar applicant chooses the number of patents subject to litigation, and informs the reference product sponsor of that number. 42 U.S.C. § 262(l)(5)(A). The parties then exchange a list of their desired patents. 42 U.S.C. § 262(l)(5)(B). If the biosimilar applicant does not identify any patents, the reference product sponsor can litigate a single patent of its choosing, with the right to sue on other identified patents upon the biosimilar applicant's notice of commercial marketing. 42 U.S.C. § 262(l)(8)(B), (9)(A). The entire process can take about eight months or longer to complete before any litigation even begins.

The BPCIA makes it a technical act of infringement to submit an application seeking to market a biosimilar product claimed in the parties' patent disclosures. 35 U.S.C. § 271(e)(2)(C)(i). Alternatively, if the biosimilar applicant declines to provide its application, the BPCIA makes it a technical act of infringement to submit the application seeking to market a biosimilar product that "*could be identified*" through the patent exchange process. 35 U.S.C. § 271(e)(2)(c)(ii) (emphasis added). Through that mechanism, the BPCIA, like the Hatch-Waxman Act, creates an artificial act of infringement, and thus confers jurisdiction on a district court to resolve a patent dispute in circumstances where it otherwise might

-29-

not exist. *See Eli Lilly and Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990) (explaining, in context of generic drugs, that the "highly artificial act of infringement" in submitting FDA application is intended to "enable the judicial adjudication" of patent rights).

In particular, a justiciable case or controversy might not otherwise exist where a prolonged period of statutory exclusivity protects the reference product from biosimilar competition. Under the BPCIA, a reference product enjoys a period of 12 years of exclusivity, during which time the FDA may not approve a competing biosimilar application, 42 U.S.C. § 262(k)(7)(A), and a four-year exclusivity period prohibiting the FDA from receiving competitive biosimilar applications, 42 U.S.C. § 262(k)(7)(B). Thus, there is a period of up to *eight* years between the time a biosimilar application can be filed and approved. The availability of a § 271(e) action provides a way for a patent holder to obtain resolution of its rights during that extended period of time, long before approval and marketing of the biosimilar drug product upon expiration of the exclusivity period.

But when there is no exclusivity for the reference product preventing FDA approval, a § 271(e) infringement action that takes eight months to even begin is completely ineffective in resolving patent disputes before approval. In that circumstance the *only way* to resolve patent disputes in a timely manner is through

a declaratory judgment action brought before the submission of a subsection (k) application.[1]

The BPCIA takes this circumstance into account in two ways. First, the BPCIA contains no provision limiting a declaratory judgment action from being filed before the submission of a biosimilar application—thus permitting the filing of a declaratory judgment action where a justiciable patent dispute already exists. Second, even after a biosimilar application is filed, the BPCIA acknowledges either party may file for a declaratory judgment, notwithstanding the completion of patent exchanges, once a biosimilar applicant provides notice of its intended commercial marketing. 42 U.S.C. §§ 262(l)(8)(A) & (9)(A). By allowing either party to file for declaratory judgment action upon notice of intended commercial marketing, the BPCIA provides a vehicle for both parties to seek resolution of underlying patent disputes before the commercial marketing begins.[2]

---

[1] Given the statutory structure of the BPCIA, this circumstance will likely exist for every biosimilar applicant for a transition period of several years. The major biologic reference products for which biosimilar products are being developed were first approved in the 1990s, and thus are not subject to any remaining marketing exclusivity. 42 U.S.C. § 262(k)(7). In the future, when reference biologic products will enjoy lengthy periods of regulatory exclusivity against biosimilar competition, this circumstance will exist less frequently, and § 271(e) infringement actions may well be adequate to resolve patent certainty prior to the approval and launch of biosimilar products.

[2] The only exceptions, discussed below, involve situations where the biosimilar application previously "fail[ed]" to comply with a statutory duty, such as by

It was simply error for the district court to conflate provisions for a § 271(e) infringement action with an alleged infringer's declaratory judgment claim. These exchanges are not requirements for a declaratory judgment action brought to resolve a controversy for alleged infringement under other portions of the patent code, such as 35 U.S.C. § 271(a). Nor are they even relevant except in the limited fashion provided by the BPCIA's three specific provisions on declaratory judgments (discussed below). It makes no sense to interpret jurisdiction-conferring provisions—applicable to a reference product sponsor's infringement action—to jurisdictionally bar a different type of claim with a different statutory purpose.

Indeed, this Court has observed that "declaratory relief is alternative and cumulative" and "the existence of another adequate remedy does not bar a declaratory judgment." *Lang v. Pac. Marine and Supply Co., Ltd.*, 895 F.2d 761, 764 (Fed. Cir. 1990) (quoting 10A Wright & Miller § 2758 at 620, 621). "The Declaratory Judgment Act applies 'whether or not further relief is or could be sought.'" *Id.* (quoting 28 U.S.C. § 2201). Thus, the availability of a 271(e) infringement action—or lack thereof—does not bar either the reference product sponsor or biosimilar applicant from filing for declaratory judgment. The jurisdictional requirements for the one action have nothing to say about the other.

---

refusing to provide a copy of the FDA application to the reference product sponsor. 42 U.S.C. § 262(l)(9)(B)-(C).

Here, Sandoz need not rely on a "highly artificial" act of infringement for jurisdiction, *Eli Lilly*, 496 U.S. at 678, because a justiciable controversy *already* exists under the Declaratory Judgment Act for the reasons set forth below. Nor do Sandoz and Amgen need to engage in a series of patent exchanges to identify a dispute about the '182 and '522 patents. Amgen has trumpeted its claim that these submarine patents cover "the fusion protein that is etanercept"—the active ingredient in Sandoz's biosimilar version of Enbrel®, A1357—and Sandoz has provided its contrary viewpoint, A1555-57.

Nothing about Sandoz's complaint conflicts with any provision of the "mandatory" disclosures underlying a section 271(e) claim for infringement, and the district court identified no reason why the two actions could not peacefully co-exist. The pendency of this lawsuit would not preclude the parties from engaging in the BPCIA's patent exchanges. There is no reason Sandoz could not have provided the required disclosures to Amgen, and vice versa, while the declaratory judgment action was ongoing. Any action brought under § 271(e)(2)(C) could have followed accordingly and been consolidated with the declaratory judgment action for discovery or trial.

### 2. The BPCIA's specific limitations on declaratory judgment actions do not apply to Sandoz's complaint.

Had Congress intended to deprive the federal courts of jurisdiction over declaratory judgment actions brought prior to the filing of a biosimilar application,

it would have included a provision in the BPCIA that says as much. It did not. Instead, it includes three very specific limitations on declaratory judgments that can only apply, if at all, after a biosimilar subsection (k) application is filed.

### a. The BPCIA imposes no limitations on a declaratory judgment action filed before a subsection (k) filing.

The BPCIA's first limitation on declaratory judgments applies only "*[i]f a subsection (k) applicant provides the application* and information required under paragraph (2)(A)." 42 U.S.C. § 262(l)(9)(A) (emphasis added). In that case, "neither the reference product sponsor nor the subsection (k) applicant may, prior to the date notice [of commercial marketing] is received under paragraph (8)(A), bring any action under section 2201 of title 28, United States Code, for a declaration of infringement, validity, or enforceability of any patent *that is described in clauses (i) and (ii) of paragraph 8(B)*." *Id.* (emphasis added). This limitation serves to prevent the reference product sponsor from suing the biosimilar applicant on patents the parties initially identified, but which did not make the list to be litigated under § 271(e).[3]

---

[3] This circumstance could occur, for instance, if the biosimilar applicant chose to limit the number of patents subject to a § 271(e) case. *See* 42 U.S.C. § 262(l)(5)(A). Paragraph 9(A) also prevents the subsection (k) applicant from suing for a declaratory judgment on such patents. However, once the applicant provides notice of commercial marketing under paragraph (8)(A), either party may file a declaratory judgment action.

This provision clearly does not bar Sandoz's complaint because **(1)** Sandoz is not a "subsection (k) applicant"; **(2)** it has not "provide[d] the application" to Amgen; and **(3)** the '182 and '522 patents are not patents "described in clauses (i) and (ii) of paragraph 8(B)"—patents the parties identify *after* the biosimilar application is filed. *See* 42 U.S.C. § 262(l)(8)(B).

The other two limitations on declaratory judgments are remedial measures directed at a subsection (k) applicant who declines to perform certain acts in the manner required by the patent exchange process described in the BPCIA statute. They do not apply here. Paragraph 9(B), entitled "*Subsequent failure to act by subsection (k) applicant*," provides that "[i]f a subsection (k) applicant fails to complete" one of several statutory duties, "the reference product sponsor, but not the subsection (k) applicant, may bring an action under section 2201 of title 28 for a declaration of infringement, validity, or enforceability of *any patent included in the list described in paragraph (3)(A), including as provided under paragraph (7).*" 42 U.S.C. § 262(l)(9)(B) (emphasis added).

Again, the provision does not apply to Sandoz's complaint, because **(1)** Sandoz is not a "subsection (k) applicant"; **(2)** it did not "fail" to complete any action required of it, since the specified duties accrue, if ever, only *after* the filing of an FDA application; and **(3)** the '182 or '522 patents are not "described in paragraph (3)(A)" (a list a reference product sponsor provides 60 days *after*

receiving the biosimilar application) or in "paragraph 7" (patents issued to or exclusively licensed by a reference product sponsor *after* a biosimilar application is filed, *see* 42 U.S.C. § 262(l)(7)).

The third and final limitation on declaratory judgments, Paragraph 9(C), only applies "*[i]f a subsection (k) applicant fails to provide* the application and information required under paragraph (2)(A)"—confidential information about the product. 42 U.S.C. § 262(l)(9)(C) (emphasis added). Once again, the provision does not apply because Sandoz is **(1)** not a "subsection (k) applicant" and **(2)** did not "fail" to provide information under paragraph (2)(A). Paragraph (2)(A) states that the application shall be provided "[n]ot later than 20 days after the Secretary notifies the subsection (k) applicant that the *application has been accepted for review*." 42 U.S.C. § 262(l)(2)(A) (emphasis added). That deadline has not even occurred.

Without acknowledging the specific text of any of these three paragraphs, the district court held that Sandoz "cannot bring an action for declaratory relief *until, at a minimum*, it has complied with its obligations under § 262(l)(2)(A)"—providing its application to the reference product sponsor. A3 (emphasis added). In reaching this conclusion, the district court was apparently referencing the §§ 262(l)(9)(B) & (C), although the court did not cite or quote them specifically.

-36-

Neither of these provisions, however, says that declaratory judgment actions are barred "until" an applicant makes patent exchanges.

The penalty provisions deprive courts of jurisdiction over declaratory judgment actions where a "subsection (k) applicant fails to provide" certain information. 42 U.S.C. §§ 262(l)(9)(B)-(C). There is a very big difference between a provision that ***deprives*** a court of jurisdiction where an applicant ***fails*** to perform a task (as in §§ 262(l)(9)(B) and (C)), and a provision that ***confers*** jurisdiction ***only after*** a task is performed (as in the district court's imaginary provision). The specific text of the penalty provisions confirms that they are of the former variety, and thus, do not apply here.

### b.    The district court was not at liberty to apply a jurisdictional bar of its own creation.

In reaching its contrary conclusion, the district court appeared to be concerned that Sandoz's complaint would have the effect of side-stepping litigation procedures that it erroneously believed would be mandatory after Sandoz's biosimilar application is filed. But even assuming its concern was valid—and it is not for numerous reasons—the court was not empowered to engraft a nonexistent jurisdictional bar onto the BPCIA.

"[T]he role of the judicial branch is to apply statutory language, not to rewrite it." *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000). A court "is empowered to rewrite neither statutes nor regulations, however unwise, nor does it

have the information base nor expertise to do so effectively." *Newport News Shipbuilding and Dry Dock Co. v. Garrett*, 6 F.3d 1547, 1558 (Fed. Cir. 1993).

This concern is particularly acute where a court "interprets" a statute to create a jurisdictional bar not present in its actual text. In *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, the Supreme Court held it was error to apply a putative jurisdictional bar that was not expressly stated in the text of the Hatch-Waxman Act. 132 S. Ct. 1670, 1680 n.5 (2012). The court explained: "we are not inclined to interpret statutes as creating a jurisdictional bar when they are not framed as such." *Id.* (quoting *Stern*, 131 S. Ct. at 2607).

Here, creating a jurisdictional bar preventing *prospective* subsection (k) applicants from filing for declaratory judgment is not only unlawful, but illogical, because subsection (k) is not the only way to obtain FDA approval of a biosimilar product. A potential applicant, who has tested its product in Phase III clinical studies, may alternatively file a subsection (a) application, which does not rely on a reference product sponsor's data. *See* 42 U.S.C. § 262(a). None of the provisions the district court cited to preempt Sandoz's complaint even arguably apply to a subsection (a) filing. Yet, by applying the BPCIA to *potential* subsection (k) applicants, the district court erroneously extended those inapplicable provisions to potential subsection (a) applicants as well.

That error is particularly relevant here. Sandoz began its development of etanercept in 2004, A2052 (¶ 2), years before the BPCIA was even passed, and even Amgen noted the possibility that Sandoz could have pursued a subsection (a) application for its product, A1016-17. Given the district court's destructive statutory construction—which stands to prevent Sandoz from achieving resolution of its rights for years after FDA approval under subsection (k)—Sandoz could be able to obtain patent certainty and market its product more quickly through a declaratory judgment action and a subsection (a) application than it would by filing an application under the "accelerated" pathway the district court rendered essentially useless for achieving patent certainty. But through its erroneous construction, the district court deprived Sandoz of that opportunity too.

### 3.     Nothing in the BPCIA requires a declaratory judgment action to await FDA approval of the biosimilar product.

The district court chided Sandoz for not complying with "mandatory" disclosure obligations by filing a lawsuit before an FDA application. Yet, the BPCIA would not bar Sandoz's declaratory judgment action, even *assuming* the statute applied to prospective subsection (k) applicants, which it does not.

As discussed, the BPCIA only contains three limitations on declaratory judgment actions. Sandoz has not "failed" to comply with paragraphs 9(B) and (9)(C), and cannot be presumed to violate them in the future. Paragraph 9(A) would not apply either. Since Sandoz provided notice of its intended commercial

marketing to Amgen prior to bringing this action, it would not be forbidden from bringing a declaratory judgment action under paragraph 9(A), even assuming the BPCIA's provision applied to prospective biosimilar applicants.

In reaching a contrary conclusion, the district court issued another broad and erroneous construction of the statute. According to the district court, notice of commercial marketing cannot be given until *after* the FDA has already approved the biosimilar drug. Thus, it held that no declaratory judgment action can be filed under Paragraph 9(A) until after a biosimilar applicant obtains FDA approval. This extreme result is completely unjustified.

The district court based its holding entirely on a *sua sponte* interpretation of the text of Paragraph 8(A), which provides:

> NOTICE OF COMMERCIAL MARKETING.—The subsection (k) applicant shall provide notice to the reference product sponsor not later than 180 days before the date of the first commercial marketing of the biological product licensed under subsection (k).

42 U.S.C. § 262(l)(8)(A). According to the district court, because the provision refers to notice of commercial marketing for a "biological product licensed under [§ 262] subsection (k)," no notice can be provided before the subsection (k) application is "licensed." A3.

That is not reasonable. Paragraph 8(A) clearly does ***not*** say that a subsection (k) applicant must wait until ***after*** product approval to give the reference product sponsor ***notice*** of its intended commercial marketing. Indeed,

-40-

the paragraph contains no restriction at all on *when* notice can be given. The only restriction is that notice must be given, and the biosimilar applicant cannot market its product until 180 days after it provides notice.

Certainly, if Congress had intended to provide a limitation on when notice can be given under the statute, it would have included an express provision saying as much. It did not. In concluding otherwise, the district court rewrote paragraph (8)(A) in a manner contrary to its express terms, and in a manner that, if followed, would provide an additional 180 days of reference product exclusivity that Congress never envisioned.

## B.    The district court's statutory construction affirmatively obstructs the purposes of the BPCIA.

Through its erroneous construction, the district court reached a result that affirmatively obstructs the very purposes the BPCIA was designed to serve.

### 1.    The district court's statutory construction needlessly delays the availability of lower-cost biologic medicines.

The whole purpose of the BPCIA is to provide an abbreviated procedure for approval of biosimilar drug products, in order to effectuate price competition in biologic drugs, which are the most expensive drugs money can buy. *See* H.R. 3590-686, 111th Cong. § 7001(a)-(b) (2009-2010) ("Biologics Price Competition and Innovation," "It is the sense of the Senate that a biosimilars pathway balancing innovation and consumer interests should be established."). If a potential

biosimilar drug applicant cannot obtain clarity of its rights in a timely manner—which the district court's construction ensures—then the statute is ineffectual in advancing its underlying purpose, delaying the availability of low-cost, biosimilar drugs to American consumers.

The top-selling biologic drugs, including Enbrel®, have *multiple* billions of dollars in sales per year. *See* A1136-37. For many of these drugs, there is no remaining exclusivity period, meaning that a biosimilar drug product will be subject to immediate FDA approval and launch. But due to the size of these markets, biosimilar drug applicants typically will not "bet the company" and launch a competitive product at the risk of a potentially catastrophic damages claim. Absent timely resolution of patent disputes, the BPCIA's purpose of encouraging price competition will be thwarted.

Congress and all of the stakeholders recognized as much when crafting and debating patent provisions for the BPCIA. At Congressional hearings debating proposed patent provisions, the witnesses were in broad agreement about the need to achieve patent certainty before commercial marketing. Jeffrey Kushan, partner at Amgen's own counsel Sidley Austin LLP, testified on behalf of the Biotechnology Industry Organization, which represents the interests of BLA holders:

> [A]ny legislation must include a balanced and fair procedure for
> identifying and resolving patent disputes implicated by the structure

> of a biosimilar product and how it is made ***before the biosimilar product is approved and put on the market***.  Nearly all stakeholders agree that doing so is better for patients, caregivers, and both innovator and biosimilar companies.

*Biologics and Biosimilars: Balancing Incentives for Innovation*, *Hearing Before the Subcomm. On Courts and Competition Policy of the H. Comm. on the Judiciary*, 111th Cong. 46 (July 14, 2009) (hereinafter "Biologics and Biosimilars").  To achieve that goal, another prominent witness explained, "[w]e need things like declaratory judgment, actions being available to the follow-on applicant."  *Id.* at 222 (statement of T. Stanek Rea on behalf of the AIPLA in response to the question "what is the best way to resolve a patent dispute in a world that includes biosimilar competition").

Congress further recognized that declaratory judgment actions would need to be filed at least three years in advance of marketing.  In an early draft of legislation subject to debate in the House, the bill provided a limitation precluding a declaratory judgment lawsuit where the action was filed more than three years prior to commercial launch.  *See* Krista H. Carver et al., *An Unofficial Legislative History of the Biologics Price Competition and Innovation Act of 2009*, 65 FOOD AND DRUG L.J. 671, 772 (2010).  This provision was widely criticized during

Congressional hearings, and subsequently removed from the bill that passed the House.[4]

Sandoz's lawsuit, filed three years before Sandoz's intended commercial marketing, is entirely consistent with the recognition that three years would be necessary for resolving declaratory judgment actions before commercial launch, and the underlying goal of the BPCIA's litigation provisions to achieve patent certainty prior to commercial launch. The district court's imposition of a non-existent jurisdictional bar affirmatively obstructs that purpose in this case, and threatens to do so in every other case involving a similarly situated plaintiff.

> **2.     The district court's construction erroneously deprives Sandoz of any reasonable way to resolve its rights prior to commercial marketing.**

The district court provided no explanation for why delaying a declaratory judgment action until after product approval makes sense. The very purpose of a declaratory judgment action brought by an accused infringer is precisely "to provide the allegedly infringing party relief from uncertainty and delay regarding

---

[4] Biologics and Biosimilars at 205 ("The assumption that a patent infringement litigation can be resolved in 3 years may not necessarily hold true."); *id.* at 35 (Dec. 22, 2008 Letter from Bruce A. Leicher of Momenta to the Federal Trade Commission) ("As proposed at the Roundtable, one would anticipate litigation lasting four (4) years in [a] biologic patent."); *id.* at 21 ("Because this would not provide sufficient time to complete litigation, it would extend biologic entry well beyond the 12-14 years data exclusivity period in the bill.").

its legal rights," *Micron*, 518 F.3d at 902 (citation omitted), and to avoid "the necessity ... of having to act at one's peril or to act on one's own interpretation of his rights, or abandon one's rights because of a fear of incurring damages," *Arkema*, 706 F.3d at 1357 (citation omitted).

Under the district court's reasoning, Sandoz has no recourse to the federal courts to resolve its rights under Amgen's submarine patents—not now, not when it files its FDA application, and not until after its FDA application is approved. The possibility of Amgen bringing a § 271(e) action provides no relief, because it takes nearly eight months to engage in the preliminary patent exchanges that precede such an action—nearly as long as the FDA's product approval timeline— and even after the exchanges are complete, Amgen has no obligation to sue Sandoz on both of the patents.

The district court's holding means the only way Sandoz could ever have any assurance of patent clarity is by filing a declaratory judgment after product approval. At that point, Sandoz likely would have to wait for three years or more to receive a judgment on the merits, and even longer to receive an appellate decision. The judgment below guarantees that, during that extended period of time awaiting judicial resolution, Sandoz would either have to abandon its product launch or act on its "own interpretation of [its] rights" and launch the product at the risk of a potentially catastrophic damages claim. *Arkema*, 706 F.3d at 1357

(citation omitted).  That result is clearly not what Congress intended, nor is it what the plain language of the BPCIA requires.

> **3.    The district court's statutory construction erroneously manufactures an additional exclusivity period that Congress never intended.**

Finally, because the district court held that a biosimilar applicant cannot provide notice of its commercial marketing before its product approval, and because the BPCIA prevents the biosimilar applicant from marketing its product until six months after providing notice, the court's construction of the statute creates an additional six-month period of exclusivity for the reference product sponsor after approval—in *all* cases and *regardless* of whether the product is even arguably protected by any patents.

This result is completely unjustifiable.  After extensive debate, Congress determined that a *12-year* exclusivity period was an adequate incentive to encourage investment and incentive in obtaining the right to market reference biologic products—and no more.  The terms of the BPCIA reflect this policy determination, by prohibiting the FDA from approving any biosimilar application until 12 years have passed from the date that the reference product was first approved.  42 U.S.C. § 262(k)(7)(A).  There is nothing in the statute or its legislative history indicating Congress intended to tack on an additional six months of exclusivity *after* the FDA approves the biosimilar drug.  By adding a non-

existent requirement limiting the biosimilar applicant from providing notice until after FDA approval, the district court created—likely unwittingly—an additional exclusivity period all of its own.

Although the BPCIA does contemplate extending the 12-year period to add an additional six-month period, this extension only applies when the FDA requests—and the reference product sponsor conducts—additional studies on the reference biologic drug showing a health benefit in a pediatric population. 42 U.S.C. § 262(m)(2)(a), (3)(a). In that instance, the exclusivity periods "for such biological product referred to in subsection (k)(7) are deemed to be 4 years and 6 months rather than 4 years and *12 years and 6 months* rather than 12 years." *Id.* (emphasis added). This specifically stated extension to the 12-year period confirms that when Congress intended to extend that period, it set forth that intent in the statutory text.

Apart from defying Congress' policy judgment and the text of the statute, the district court's construction of the 180-day notice provision advances no rational purpose. The point of the notice provision is to give the reference product sponsor adequate time to seek a declaratory judgment or preliminary injunction before the commercial marketing of the biosimilar product. Delaying the date notice can be given until *after* FDA approval does not advance the notice function of this provision, since the notice period remains at 180 days irrespective of when

-47-

notice is given.  Even more perversely, under the district court's construction, the extra six months of exclusivity would apply even where the reference product sponsor lacks patent coverage at all, and where there is no other bar to the launch of a biosimilar product.  In that circumstance, there is no real purpose in giving notice at all, so delaying such notice until after product approval would lead to a truly irrational extra six months of exclusivity.

In the absence of any rational basis for doing so, it was error for the district court to interpret the BPCIA in a way that provides a guaranteed additional six months of exclusivity to a reference product sponsor.  The district court's construction fundamentally conflicts with Congress' policy judgment, disrupts the exclusivity scheme of the statute, and provides an unwarranted windfall to the reference product sponsors at the expense of biosimilar applicants and the public at large.  The district court's construction should be vacated for all of these reasons.

## II.    The District Court Erred In Concluding There Is No Case or Controversy.

Alternatively, the district court dismissed the case because it determined that there was not a justiciable "case or controversy."  The district court's conclusion is inconsistent with the policy and principles of the Declaratory Judgment Act, and conflicts with both the Supreme Court's and this Court's precedent.  The district court had jurisdiction, and it was error to dismiss the case.

## A.    Jurisdiction under the Declaratory Judgment Act extends to the greatest scope allowed by Article III.

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy," the district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.  The *sole* requirement "is that the conflict be real and immediate, i.e., that there be a true, actual 'controversy' required by the Act."  *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96 (1993) (citation omitted).  The Act thus extends to the greatest scope allowed by Article III of the Constitution.  *Caraco Pharm. Labs, Ltd. v. Forest Labs, Inc.*, 527 F.3d 1278, 1290 (Fed. Cir. 2008).

Jurisdiction will exist where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune*, 549 U.S. at 127 (citation omitted).  "[A]n 'actual controversy' requires only that a dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts.'"  *Teva*, 482 F.3d at 1339 (quoting *Medimmune*).  "Merely the desire to avoid the threat of a 'scarecrow' patent, in Learned Hand's

phrase, may therefore be sufficient to establish jurisdiction under the Declaratory Judgment Act." *Cardinal*, 508 U.S. at 96.

Although this Court previously required declaratory judgment plaintiffs to have a "reasonable apprehension" of being sued, the Supreme Court rejected that rule in *MedImmune*, liberalizing the standard for declaratory judgment actions. *Micron*, 518 F.3d at 900-02.  "[T]he now more lenient legal standard facilitates or enhances the availability of declaratory judgment jurisdiction in patent cases." *Id.* at 902.  After *MedImmune*, a controversy exists "where the ***patentee takes a position*** that puts the declaratory judgment plaintiff in the position of either ***pursuing arguably illegal behavior or abandoning*** that which he claims a right to do." *SanDisk*, 480 F.3d at 1381 (emphasis added).  Thus, a patentee's public statements about its patent position may demonstrate the existence of a controversy.  *See Micron*, 518 F.3d at 901 ("MOSAID's recent public statements and annual reports also confirm its intent to continue an aggressive litigation strategy.").  And a patentee's refusal to grant a license also "suggests that there is an active and substantial controversy between the parties." *Arkema*, 706 F.3d at 1358.

**B.    The district court's judgment cannot be reconciled with the Supreme Court's decision in *MedImmune*, or this Court's cases applying it.**

Without even mentioning the applicable legal standards, discussed at length in Sandoz's briefs, the district court dismissed the complaint because "defendants state they have never advised Sandoz they intend to sue Sandoz."  A4.  In reaching this conclusion, the district court misapplied the law.  A specific threat of a lawsuit is *not* a prerequisite for jurisdiction and it has not been since the Supreme Court specifically rejected that notion in *Medimmune*.

In *MedImmune*, the Supreme Court held a patent licensee could sue for a declaratory judgment of patent invalidity without first terminating the license, and in the absence of any specific threat of a lawsuit or imminent threat of harm.  549 U.S. at 128, 137.  In that case, MedImmune's "own acts" in paying royalties under a license "eliminate[d] the imminent threat of harm" to MedImmune.  *Id.* at 128.  Nevertheless, the Court held that jurisdiction existed.  In so holding, the Court rejected the notion that a declaratory judgment plaintiff needed to have a "reasonable apprehension" of being sued in order for jurisdiction to attach to its complaint, noting that "[t]he reasonable-apprehension-of-suit test" "conflicts with" multiple Supreme Court precedents.  549 U.S. at 132 n.11.

Following *MedImmune*, this Court has also held "a specific threat of infringement litigation by the patentee is *not required* to establish jurisdiction."

*ABB Inc.*, 635 F.3d at 1348 (emphasis added); *see also Arkema*, 706 F.3d at 1357 ("Nor is it necessary that a patent holder make specific accusations against either the potential direct infringers or Arkema."); *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, 497 F.3d 1271, 1284 (Fed. Cir. 2007); *Teva Pharm.*, 482 F.3d at 1335, 1339-40, 1345-46 (reversing dismissal of declaratory judgment action where district court concluded that the plaintiff "failed to establish a reasonable apprehension of imminent suit" since such a showing was not required under *MedImmune*).

The district court's judgment cannot stand in light of these cases, which it did not mention in its opinion below.

### C.    Amgen's specific patent claims placed Sandoz in the position of either abandoning or pursuing allegedly infringing activity.

Although the district court never analyzed the jurisdictional question under the correct legal standard, under "all the circumstances" there is a justiciable controversy between Amgen and Sandoz concerning Amgen's submarine patent claims.  *MedImmune*, 549 U.S. at 127.

Amgen has expressly "take[n] a position that puts [Sandoz] in the position of either pursuing arguably illegal behavior or abandoning that which [it] claims a right to do."  *SanDisk*, 480 F.3d at 1381 (Fed. Cir. 2007).  Amgen made its patent position clear to the entire industry, repeatedly, since the first submarine patent issued.  A2011-13 (¶¶ 53-60); A1357.  It stated its claim to "exclusivity" against

biosimilar competition in press releases, business journals, investor conference calls, and at numerous industry conferences attended by its competitors such as Sandoz. *See* A1442; A1448; A1473; A1484; A1492; A1504.

Sandoz, for its part, disputed all of these claims, and informed Amgen of its intention to proceed with its product despite Amgen's claims. Thus, at the time Sandoz brought its complaint, there was a tangible dispute between two parties about their competing rights under the same patents regarding the protein etanercept. *See SanDisk*, 480 F.3d at 1381; *Teva*, 482 F.3d at 1341-42 (noting that patentee's public claim of patent coverage was significant factor in determining controversy); *id.* at 1347 (concurring opinion of Friedman, C.J. agreeing that a justiciable controversy existed due to parties' adverse contentions about the infringement and validity of specified Orange Book patents); *Lang*, 895 F.2d at 764 (discussing *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988) and noting "that meaningful preparation for infringing activity coupled with acts of the patentee indicating an intent to enforce its patent will meet the controversy requirement").

Absent resolution of its rights, Sandoz will suffer precisely the harm that the Declaratory Judgment Act was designed to avoid. Amgen's new allegations— based on patents issuing over two decades after their claimed priority dates—have disrupted Sandoz's business. Not only does Amgen's position threaten to moot

more than REDACTED in investments and a decade of product development, A2054

(¶ 11), Amgen's position means that any further investments in Sandoz's product,

including a REDACTED facility allowing for U.S. commercialization, A2009

(¶ 43); A2056 (¶ 18), exists under the cloud of infringement and stands to be

wasted if Amgen ultimately prevails in their patent claims allegations. *See*

*Arkema*, 706 F.3d at 1359 (finding justiciable dispute where manufacturer was

faced with "present position of either committing to contracts that could expose it

to liability for indirect infringement or abandoning its plans") (emphasis removed).

In support of its contrary holding, the district court cited but a single case—

*Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329 (Fed. Cir. 2008). That case

has essentially nothing to do with the facts here. In *Prasco*, this Court found

jurisdiction lacking because the patentee had not taken *any* position under its

challenged patents at all—public or private. This Court noted that "[t]he

defendants' lack of any 'concrete claim of a specific right' is an important factor

weighing against a finding of an actual controversy." *Id.* at 1340. Here, Amgen

has made a "concrete claim of a specific right" to exclude competition for

etanercept under its submarine patents, and Sandoz made a similarly "concrete"

claim of a specific right by asserting that the patents are invalid, unenforceable,

and not infringed by etanercept, prior to bringing this lawsuit. *Id.*; A1555-57.

*Prasco* thus reinforces that jurisdiction exists here, not undermines it.

While the district court focused myopically on an "imminent" threat, it is precisely the fact that Amgen **will not** sue immediately, despite making exclusionary claims under its submarine patents, that is damaging to Sandoz. The Declaratory Judgment Act exists in order to remedy a situation where the patent hangs as a sword of Damocles over an accused product's development. *See Sony Elecs.*, 497 F.3d at 1284 ("Indeed, as we have previously acknowledged, the Declaratory Judgment Act was intended to fix the problem that arises when the other side **does not sue**.") (emphasis added); *see also MedImmune*, 549 U.S. at 132 n.11 (discussing prior Supreme Court decision in *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239 (1937), "where jurisdiction obtained even though the **very reason** the insurer sought declaratory relief was that the insured had given **no indication that he would file suit**.") (emphasis added)).

Without the ability to obtain clarity of its rights under Amgen's patents, Sandoz not only will be required to continue its product development under a cloud of alleged infringement, it will inevitably be required to choose between launching its product at risk or giving up what it believes it has a right to do. That circumstance is the "quintessential example of a situation in which declaratory relief is warranted," *Arkema*, 706 F.3d at 1357. Indeed, the dilemma of "having to act at one's peril . . . or abandon one's rights because of a fear of incurring damages" is greatly magnified where launching an allegedly infringing product to

-55-

compete against a multi-billion dollar medication will give rise to a potentially devastating damages claim. *Id.* at 1356 (citation omitted).

The existence of a controversy is further bolstered by other circumstances, which indicate that there is no question that the parties have a *bona fide* dispute. Amgen has declined to provide a license to Sandoz under the submarine patents, which, of course, makes sense because Amgen's entire business strategy requires *excluding* biosimilar competition, not licensing them. *See* A1357; A1441-44; A1448; A1464; A1474; A1484; A1492; A1504; A1118-19; *see also Arkema*, 706 F.3d at 1358 (noting that a refusal to grant a license "suggests that there is an active and substantial controversy between the parties").

Further, during the litigation below, Amgen all but admitted that it intended to sue Sandoz in the future. A1006-10. Thus, there is no real question about the existence of a dispute between the parties. The only issue is *when* it should be resolved. The Declaratory Judgment Act answers that question by providing a vehicle for Sandoz to seek relief from the legal uncertainty immediately.

**D.    The parties' dispute is sufficiently "real" and "immediate" for adjudication in light of the advanced stage of Sandoz's product development.**

Finally, the district court held that "Sandoz's allegation that it intends in the future to file an application with the FDA is insufficient to create a case or controversy." A4. Sandoz, however, never argued that the court had jurisdiction

merely because it intends to file an FDA application in the future. What Sandoz pointed out—in great detail through two lengthy and detailed affidavits—was that it engaged in "substantial preparation" for allegedly infringing activity by engaging in nearly a decade of product development, and that its product was "substantially fixed" and could not change in any way relevant to the patents. A2041 (citing A2052-54 (¶¶ 2-12); A2062 (¶ 16); A2042 (citing A2060-63 (¶¶ 8-14,18); A2066 (citing A2062 (¶ 16); A2052-55 (¶¶ 5-7, 13).

In patent cases, "the reality requirement is often related to the extent to which the technology in question is 'substantially fixed' as opposed to 'fluid and indeterminate' at the time declaratory relief is sought." *Cat Tech LLC v. TubeMaster, Inc*., 528 F.3d 871, 882 (Fed. Cir. 2008) (citation omitted). Where the technology is substantially fixed, as opposed to "in an early stage of development," the reality requirement is satisfied. *Id*. The purpose of this requirement is to ensure that the court is adjudicating a dispute about an actual product, as "distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune*, 549 U.S. at 127.

Here, far from being "in an early stage," Sandoz's product is in the very final stage of development. It has been thoroughly developed over the course of nine years, shown to be identical or highly similar to Enbrel® in a wide array of molecular studies, tested in humans and animals, and shown to possess equivalent

pharmacokinetics and safety to Amgen's Enbrel® in humans.  A2052-53 (¶¶ 4-5); A2054 (¶¶ 9-10); A2060-61 (¶¶ 7, 9).  Even if one were to assume that the product could change in *some* way, it could not change in any way *relevant to this dispute*. Amgen claims that its two submarine patents claim the very "protein that is etanercept," the active ingredient in Sandoz's product.  A1357.  Sandoz's product *is* etanercept, and has been shown to have the same amino acid sequence as the active ingredient in Enbrel®.

The "immediacy" requirement focuses on whether a party has engaged in "meaningful preparation" for making or using an infringing product, as compared to seeking an advisory opinion "on whether it would be liable for patent infringement if it were to initiate some *merely contemplated activity*."  *Cat Tech*, 528 F.3d at 881 (emphasis added).  "Immediacy" does not require a present act of infringement.  *Arkema*, 706 F.3d at 1356-57.  Rather, in *Glaxo, Inc. v. Novopharm, Ltd.*, this Court found a dispute was "immediate" where a generic drug manufacturer "was systematically attempting to meet the applicable regulatory requirements while preparing to import its product."  110 F.3d 1562, 1571 (Fed. Cir. 1997).

Sandoz's etanercept product is no "merely contemplated activity."  *Cat Tech*, 528 F.3d at 881.  Sandoz has expended tremendous resources, time, and effort to develop its product to a stage where it is ready for FDA submission and

commercialization following the final confirmatory Phase III clinical trial.  A2052-54 (¶¶ 2-11); A2060-63 ( ¶¶ 8-14, 18).  There is no question Sandoz has engaged in "meaningful preparations," *Cat Tech*, 528 F.3d at 881, or that it has been "systematically attempting to meet the applicable regulatory requirements," *Glaxo*, 110 F.3d at 1571.

The district court cited *Benitec Austrl., Ltd. v. Nucleonics, Inc*., 495 F.3d 1340 (Fed. Cir. 2007), and *Telectronics Pacing Sys., Inc. v. Ventritex, Inc*., 982 F.2d 1520 (Fed. Cir. 1992), in support of its apparent conclusion that a dispute is not sufficiently "immediate" until after an FDA filing.  A4.  However, neither case supports that conclusion, and the cases have nothing to do with the facts here.

In *Benitec*, the declaratory judgment plaintiff had a "vaguely defined" plan to expand its "nascent" technology into veterinary products.  495 F.3d at 1348-49; *see also Cat Tech*, 528 F.3d at 881 (discussing *Benitec*).  The plaintiff, who sought declaratory relief in 2005, did not even anticipate filing an NDA until "at least 2010-2012, if ever."  *Cat Tech*, 528 F.3d at 881 (discussing *Benitec*).  Thus, there was a minimum of five to seven years before an FDA application might be submitted, if at all.  *Telectronics* presented a similar situation.  There, the medical device in question had barely started clinical development and FDA submission was still "years away."  982 F.2d at 1527.  As this Court later explained, both cases

presented extreme situations where the product design was "fluid and in an early stage of development." *Cat Tech*, 528 F.3d at 882.

This Court has never adopted a *per se* rule that jurisdiction for a declaratory judgment action must await an FDA filing. Nor is there any place for such a rule, since the jurisdictional inquiry must take into account "all the circumstances" and an FDA filing is neither dispositive of a "fixed" product or the question of whether the accused infringer has engaged in "substantial preparations" directed towards that allegedly infringing activity. As long as the requirements of immediacy and reality are met—as they are here—there is no reason why jurisdiction should not attach because Sandoz's final, confirmatory Phase III clinical trial is ongoing and it will file its FDA application shortly thereafter.

Indeed, Amgen itself has successfully sued its competitors for a declaratory judgment of *future* infringement in similar circumstances. In *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1346 (Fed. Cir. 2009), this Court exercised jurisdiction over an appeal stemming from a declaratory judgment action Amgen filed against Roche based on Roche's development of a competitive erythropoietin drug. Amgen sued *six months before* Roche's FDA filing was made, A1057-66 (complaint dated 11/8/2005); A1035 (stating that Roche filed its application one week prior to the 4/26/2006 filing), basing its claim on Roche's intent to market its product and its substantial preparations to do so, A1063-65

(¶¶ 27-31).  The district court agreed that jurisdiction existed.  *See Amgen, Inc. v. F. Hoffman-LaRoche Ltd.*, 456 F. Supp. 2d 267, 276-78 (D. Mass. 2006) (finding a controversy existed based on Roche's substantial preparations for infringing activity and that an expected approval date of "20 to 24 months away can be considered sufficiently imminent by this Court").

If Amgen can sue for future infringement based on a competitor's substantial preparations to market a competitive product prior to an FDA filing, it is equally true that Amgen is subject to suit for declaratory judgment under essentially the same circumstances here.  "It logically follows that if such an action creates a justiciable controversy for one party, the same action should create a justiciable declaratory judgment controversy for the opposing party."  *Teva*, 482 F.3d at 1342.

## CONCLUSION

The district court's judgment should be reversed, and the case remanded for further proceedings.

Dated:  March 14, 2014                    Respectfully submitted,

                                          /s/ James F. Hurst
                                          James F. Hurst
                                          Maureen L. Rurka
                                          James M. Hilmert
                                          Winston & Strawn LLP
                                          35 W. Wacker Drive
                                          Chicago, Illinois 60601

(312) 558-5600
jhurst@winston.com

*Counsel for Plaintiff-Appellant
Sandoz Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2014, I caused the foregoing

CORRECTED NONCONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT

SANDOZ INC. to be electronically filed with the Clerk of Court using the

CM/ECF system, and thereby served via CM/ECF on the counsel for Defendants-

Appellees Amgen Inc. and Hoffmann-La Roche Inc.

Dated:  March 14, 2014                    /s/ James F. Hurst
                                          James F. Hurst

                                          *Counsel for Plaintiff-Appellant*
                                          *Sandoz Inc.*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,756  words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times New Roman, a proportionally spaced typeface, using Microsoft Word 2010.


Dated:  March 14, 2014                          /s/ James F. Hurst
                                                James F. Hurst

                                                *Counsel for Plaintiff-Appellant*
                                                *Sandoz Inc.*

# ADDENDUM

# TABLE OF CONTENTS

Order Granting Defendants' Motion to Dismiss; Dismissing Complaint
Without Leave to Amend; Vacating Hearing, Dkt. No. 101 (11/12/13)……..TAB 1

Final Judgment, Dkt. No. 104 (11/19/13)…………………………….…TAB 2

42 U.S.C. § 262……………………………………………………………....TAB 3

**TAB 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SANDOZ INC.,

        Plaintiff,

  v.

AMGEN INC., et al.,

        Defendants.

_____/

No. C-13-2904 MMC

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS; DISMISSING
COMPLAINT WITHOUT LEAVE TO
AMEND; VACATING HEARING**

      Before the Court is the "Motion by Defendants, Amgen Inc. ["Amgen"] and Hoffman-La Roche Inc. ["Roche"] to Dismiss for Lack of Subject-Matter Jurisdiction or, Alternatively, to Decline to Exercise Declaratory Judgment Jurisdiction," filed August 16, 2013. Plaintiff Sandoz Inc. ("Sandoz") has filed opposition, to which defendants have replied, and Sandoz, with leave of court, has filed a surreply. Having read and considered the papers filed in support of and in opposition to the motion, the Court deems the matter suitable for determination on the parties' respective written submissions, VACATES the hearing scheduled for November 15, 2013, and rules as follows.

## BACKGROUND

      The Food and Drug Administration ("FDA") has approved the use of "Enbrel," an Amgen product, to treat specified illnesses; Enbrel is a "human tumor necrosis factor (TNF) receptor" known as "etanercept." (See Compl. ¶ 14; Winters Decl., filed August 16, 2013,

United States District Court

For the Northern District of California

1  Ex. 22.)  Amgen takes the position that etanercept is covered by U.S. Patent No. 8,063,182

2  ("the '182 patent") and U.S. Patent No. 8,163,522 ("the '522 patent").  (See Compl. ¶ 2;

3  Winters Decl. Exs. 22, 26.)  Roche is the owner of, and Amgen is the exclusive licensee

4  under, the two subject patents.  (See Compl. ¶¶ 21-22, 29-30.)

5      Sandoz alleges it is presently conducting clinical trials to test a "biologic drug

6  containing etanercept" (see Compl. ¶ 3), and "intends to file an FDA application for

7  licensure of its etanercept product as biosimilar to Enbrel" upon completion of the clinical

8  trials (see Jankowsky Decl., filed September 19, 2013, ¶ 14).[1]

9      In its complaint, Sandoz seeks declaratory relief, specifically, a declaration that its

10 assertedly biosimilar product does not infringe any claim of either the '182 patent or the

11 '522 patent and that the subject patents are invalid and unenforceable.

12                            **DISCUSSION**

13     Defendants contend the instant action is premature for two separate but related

14 reasons, and, consequently, is subject to dismissal.  In particular, defendants argue,

15 (1) a district court lacks statutory authority to consider a patent dispute involving a

16 biosimilar product until after such time as an application for FDA approval of the biosimilar

17 product has been filed, and (2) as a factual matter, a cognizable case or controversy does

18 not presently exist.  As set forth below, the Court agrees.

19     Sandoz's claims for declaratory relief are brought pursuant to 28 U.S.C. § 2201,

20 under which a district court "may declare the rights and other legal relations of any

21 interested party seeking such declaration" in a "case of actual controversy within its

22 jurisdiction."  See 28 U.S.C. § 2201(a).  The district court's discretion to enter such

23 declaratory judgment is, however, subject to certain limitations, and, as to "actions brought

24 with respect to drug patents," the limitations set forth in "section 351 of the Public Health

25 Service Act."  See 28 U.S.C. § 2201(b).

26 _____

27     [1]A "biosimilar is a drug product designed to be similar to a previously approved
biologic drug (a 'reference product') in its quality, safety, and efficacy."  (See Roth Decl.,
28 filed September 19, 2013, ¶ 4); see also 42 U.S.C. § 262(i)(2) (defining "biosimilar"
products).

Section 351 of the Public Health Service Act, 42 U.S.C. § 262, provides the FDA with authority to license biological products that are "biosimilar to a reference product," see 42 U.S.C. § 262(k), and sets specific limitations on the timing of any litigation arising from the filing of an application for such license.  See 42 U.S.C. § 262(l); see also 28 U.S.C. § 2201(b).  Specifically, with limited exceptions not applicable here, neither a reference product sponsor, such as Amgen,[2] nor an applicant, such as Sandoz, may file a lawsuit unless and until they have engaged in a series of statutorily-mandated exchanges of information.  See 42 U.S.C. §§ 262(l)(2)-(6).

Here, Sandoz does not contend, and cannot contend, it has complied with its obligations under §§ 262(l)(2)-(6), because, as it concedes in its complaint and opposition, it has not, to date, filed an application with the FDA.  Rather, citing § 262(l)(8), Sandoz argues § 262 "provides [declaratory judgment] actions can be filed by either party upon the biosimilar manufacturer's notice of commercial marketing, which Sandoz has given here." (See Pl.'s Opp'n, filed September 19, 2013, at 24:9-10.)  The Court, for several reasons, is not persuaded.

First, as set forth in the section on which Sandoz relies, a "notice of commercial marketing" is required to be given by the applicant to the reference product sponsor "not later than 180 days before the date of the first commercial marketing of the biological product licensed under [§ 262] subsection (k)."  See 42 U.S.C. § 262(l)(8)(A).  Here, Sandoz cannot, as a matter of law, have provided a "notice of commercial marketing" because, as discussed above, its etanercept product is not "licensed under subsection (k)." See id.  Second, even after an applicant provides a "notice of commercial marketing," it cannot bring an action for declaratory relief until, at a minimum, it has complied with its obligations under § 262(l)(2)(A).  See 42 U.S.C. §§ 262(l)(9); see also 28 U.S.C. § 2201(b).

Moreover, Sandoz has not, at this time, established a "real and immediate injury or

---

[2]A "reference product sponsor" is a "sponsor of the application for the reference product."  See 42 U.S.C. § 262(l)(1)(A).  In this instance, the "reference product sponsor" is Amgen, the entity that previously obtained a license for Enbrel.

3

threat of future injury that is caused by the defendants." See Prasco, LLC v. Medicis
Pharmaceutical Corp., 537 F.3d 1329, 1338-39 (Fed. Cir. 2008) (setting forth requisite
showing by declaratory relief plaintiff to establish "case or controversy"). Here, defendants
state they have never advised Sandoz they intend to sue Sandoz, and are not in a position
to consider the propriety of such action until after Sandoz has "prepared an [application] for
approval to launch a product in the U.S." (see Mot. at 5:9-11, 6:1-3; see also id. at 18:8-11);
no evidence to the contrary has been offered. Nor has Sandoz submitted evidence
demonstrating defendants, by some means other than an express threat to sue, have
subjected Sandoz to an "immediate" threat of injury. See Prasco, 537 F.3d at 1339
(holding patentee "can cause such an injury in a variety of ways"; providing examples).
Although Sandoz points to public statements by Amgen that its patents cover etanercept,[3]
and that it defends the patents it owns (see, e.g., Compl. ¶¶ 51-60), such statements do not
suffice to show an "imminent threat," see Prasco, 537 F.3d at 1339; see also id. at 1338
(holding "mere existence of a potentially adverse patent does not cause an injury nor create
an imminent risk of an injury").

　　　　Finally, Sandoz's allegation that it intends in the future to file an application with the
FDA is insufficient to create a case or controversy. See Benitec Australia, Ltd. v.
Nucleonics, Inc., 495 F.3d 1340, 1346 (Fed. Cir. 2007) (holding "fact that [declaratory
judgment plaintiff] may file an [application for drug] in a few years does not provide the
immediacy and reality required for a declaratory judgment"); Telectronics Pacing Systems,
Inc. v. Ventritex, Inc., 982 F.2d 1520, 1527 (Fed. Cir. 1992) (affirming dismissal of
declaratory judgment action brought by patentee where accused "device had only recently
begun clinical trials, and was years away from potential FDA approval").

　　　　Accordingly, the instant action is subject to dismissal.

//

//

---

　　　　[3]As noted, Amgen markets etanercept under the brand name "Enbrel."

4

1

**CONCLUSION**

2

For the reasons stated, defendants' motion to dismiss is hereby GRANTED, and the

3

complaint is hereby DISMISSED without prejudice and without leave to amend.

4

**IT IS SO ORDERED.**

5

6

Dated: November 12, 2013

7

MAXINE M. CHESNEY
United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

# TAB 2

1

2        IN THE UNITED STATES DISTRICT COURT

3        FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5    SANDOZ, INC.,

6                                                    No. CV-13-2904 MMC

7              Plaintiff,

                                          **JUDGMENT IN A CIVIL CASE**
8      v.

9    AMGEN, INC., et al.,

10             Defendants.

11   _____/

12

13       **()  Jury Verdict.** This action came before the Court for a trial by jury. The issues
     have been tried and the jury has rendered its verdict.
14
         **(X)  Decision by Court.** This action came to trial or hearing before the Court. The
15   issues have been tried or  heard and a decision has been rendered.

16       **IT IS SO ORDERED AND ADJUDGED**

17       Defendants' motion to dismiss is hereby GRANTED, and the complaint is hereby
18   DISMISSED without prejudice and without leave to amend.

19

20

21   Dated: November 19, 2013                   Richard W. Wieking, Clerk

22                                              *Tracy Lucero*

23                                              By: Tracy Lucero
                                                Deputy Clerk
24

25

26

27

28

# TAB 3

## § 257a. Transferred

CODIFICATION

Section, Pub. L. 91–513, title I, § 4, Oct. 27, 1970, 84 Stat. 1241; Pub. L. 96–88, title V, § 509(b), Oct. 17, 1979, 93 Stat. 695, which related to medical treatment of narcotics addiction, was transferred to section 290bb–2a of this title.

## § 258. Repealed. Pub. L. 106–310, div. B, title XXXIV, § 3405(a), Oct. 17, 2000, 114 Stat. 1221

Section, acts July 1, 1944, ch. 373, title III, § 342, 58 Stat. 699; 1953 Reorg. Plan No. 1, §§ 5, 8, eff. Apr. 11, 1953, 18 F.R. 2053, 67 Stat. 631; Pub. L. 91–513, title I, § 2(a)(2)(A), Oct. 27, 1970, 84 Stat. 1240; Pub. L. 96–88, title V, § 509(b), Oct. 17, 1979, 93 Stat. 695, related to employment, establishment of industries, plants, etc., sale of commodities, and disposition of proceeds.

## § 258a. Transferred

CODIFICATION

Section, act July 8, 1947, ch. 210, title II, § 201, 61 Stat. 269, which related to transfer of balances in working capital fund, narcotic hospitals, to surplus fund, was transferred and is set out as a note under section 290aa of this title.

## §§ 259 to 261a. Repealed. Pub. L. 106–310, div. B, title XXXIV, § 3405(a), Oct. 17, 2000, 114 Stat. 1221

Section 259, acts July 1, 1944, ch. 373, title III, § 343, 58 Stat. 699; Pub. L. 91–513, title I, § 2(a)(2)(A), (3), (4), Oct. 27, 1970, 84 Stat. 1240; Pub. L. 92–293, § 3, May 11, 1972, 86 Stat. 136; Pub. L. 98–473, title II, § 232(b), Oct. 12, 1984, 98 Stat. 2031, related to convict addicts or other persons with drug abuse or drug dependence problems.

Section 260, acts July 1, 1944, ch. 373, title III, § 344, 58 Stat. 701; June 25, 1948, ch. 654, § 5, 62 Stat. 1018; July 24, 1956, ch. 676, title III, § 302(b), 70 Stat. 622; Pub. L. 91–513, title I, § 2(a)(2)(A), (3), (4), Oct. 27, 1970, 84 Stat. 1240, related to addicts and persons with drug abuse or drug dependence problems.

Section 260a, acts July 1, 1944, ch. 373, title III, § 345, as added May 8, 1954, ch. 195, § 2, 68 Stat. 79; amended July 24, 1956, ch. 676, title III, § 302(c), 70 Stat. 622; Pub. L. 91–358, title I, § 155(c)(32), July 29, 1970, 84 Stat. 572, related to admission of addicts committed from District of Columbia.

Section 261, acts July 1, 1944, ch. 373, title III, § 346, formerly § 345, 58 Stat. 701; renumbered § 346, May 8, 1954, ch. 195, § 2, 68 Stat. 79; amended Pub. L. 91–513, title I, § 2(a)(2)(A), (5), Oct. 27, 1970, 84 Stat. 1240, related to penalties for introducing prohibited articles and substances into hospitals and escaping from, or aiding and abetting escape from hospitals.

Section 261a, act July 1, 1944, ch. 373, title III, § 347, as added May 8, 1954, ch. 195, § 4, 68 Stat. 80; amended Pub. L. 91–513, title I, § 2(a)(4), Oct. 27, 1970, 84 Stat. 1240, related to release of patients and determination by Surgeon General.

PART F—LICENSING OF BIOLOGICAL PRODUCTS AND CLINICAL LABORATORIES

SUBPART 1—BIOLOGICAL PRODUCTS

## § 262. Regulation of biological products

### (a) Biologics license

(1) No person shall introduce or deliver for introduction into interstate commerce any biological product unless—

   (A) a biologics license under this subsection or subsection (k) is in effect for the biological product; and

   (B) each package of the biological product is plainly marked with—

      (i) the proper name of the biological product contained in the package;

      (ii) the name, address, and applicable license number of the manufacturer of the biological product; and

      (iii) the expiration date of the biological product.

(2)(A) The Secretary shall establish, by regulation, requirements for the approval, suspension, and revocation of biologics licenses.

(B) PEDIATRIC STUDIES.—A person that submits an application for a license under this paragraph shall submit to the Secretary as part of the application any assessments required under section 505B of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355c].

(C) The Secretary shall approve a biologics license application—

      (i) on the basis of a demonstration that—

         (I) the biological product that is the subject of the application is safe, pure, and potent; and

         (II) the facility in which the biological product is manufactured, processed, packed, or held meets standards designed to assure that the biological product continues to be safe, pure, and potent; and

      (ii) if the applicant (or other appropriate person) consents to the inspection of the facility that is the subject of the application, in accordance with subsection (c) of this section.

(D) POSTMARKET STUDIES AND CLINICAL TRIALS; LABELING; RISK EVALUATION AND MITIGATION STRATEGY.—A person that submits an application for a license under this paragraph is subject to sections 505(o), 505(p), and 505–1 of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355(o), (p), 355–1].

(3) The Secretary shall prescribe requirements under which a biological product undergoing investigation shall be exempt from the requirements of paragraph (1).

### (b) Falsely labeling or marking package or container; altering label or mark

No person shall falsely label or mark any package or container of any biological product or alter any label or mark on the package or container of the biological product so as to falsify the label or mark.

### (c) Inspection of establishment for propagation and preparation

Any officer, agent, or employee of the Department of Health and Human Services, authorized by the Secretary for the purpose, may during all reasonable hours enter and inspect any establishment for the propagation or manufacture and preparation of any biological product.

### (d) Recall of product presenting imminent hazard; violations

(1) Upon a determination that a batch, lot, or other quantity of a product licensed under this section presents an imminent or substantial hazard to the public health, the Secretary shall issue an order immediately ordering the recall of such batch, lot, or other quantity of such product. An order under this paragraph shall be issued in accordance with section 554 of title 5.

(2) Any violation of paragraph (1) shall subject the violator to a civil penalty of up to $100,000 per day of violation. The amount of a civil penalty under this paragraph shall, effective December 1 of each year beginning 1 year after the effective date of this paragraph, be increased by the percent change in the Consumer Price Index for the base quarter of such year over the Consumer Price Index for the base quarter of the preceding year, adjusted to the nearest ¹/₁₀ of 1 percent. For purposes of this paragraph, the term "base quarter", as used with respect to a year, means the calendar quarter ending on September 30 of such year and the price index for a base quarter is the arithmetical mean of such index for the 3 months comprising such quarter.

**(e) Interference with officers**

No person shall interfere with any officer, agent, or employee of the Service in the performance of any duty imposed upon him by this section or by regulations made by authority thereof.

**(f) Penalties for offenses**

Any person who shall violate, or aid or abet in violating, any of the provisions of this section shall be punished upon conviction by a fine not exceeding $500 or by imprisonment not exceeding one year, or by both such fine and imprisonment, in the discretion of the court.

**(g) Construction with other laws**

Nothing contained in this chapter shall be construed as in any way affecting, modifying, repealing, or superseding the provisions of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.].

**(h) Exportation of partially processed biological products**

A partially processed biological product which—

(1) is not in a form applicable to the prevention, treatment, or cure of diseases or injuries of man;

(2) is not intended for sale in the United States; and

(3) is intended for further manufacture into final dosage form outside the United States,

shall be subject to no restriction on the export of the product under this chapter or the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et. seq.] if the product is manufactured, processed, packaged, and held in conformity with current good manufacturing practice requirements or meets international manufacturing standards as certified by an international standards organization recognized by the Secretary and meets the requirements of section 801(e)(1) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 381(e)).

**(i) "Biological product" defined**

In this section:

(1) The term "biological product" means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide), or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

(2) The term "biosimilar" or "biosimilarity", in reference to a biological product that is the subject of an application under subsection (k), means—

(A) that the biological product is highly similar to the reference product notwithstanding minor differences in clinically inactive components; and

(B) there are no clinically meaningful differences between the biological product and the reference product in terms of the safety, purity, and potency of the product.

(3) The term "interchangeable" or "interchangeability", in reference to a biological product that is shown to meet the standards described in subsection (k)(4), means that the biological product may be substituted for the reference product without the intervention of the health care provider who prescribed the reference product.

(4) The term "reference product" means the single biological product licensed under subsection (a) against which a biological product is evaluated in an application submitted under subsection (k).

**(j) Application of Federal Food, Drug, and Cosmetic Act**

The Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.], including the requirements under sections 505(o), 505(p), and 505–1 of such Act [21 U.S.C. 355(o), (p), 355–1], applies to a biological product subject to regulation under this section, except that a product for which a license has been approved under subsection (a) shall not be required to have an approved application under section 505 of such Act.

**(k) Licensure of biological products as biosimilar or interchangeable**

**(1) In general**

Any person may submit an application for licensure of a biological product under this subsection.

**(2) Content**

**(A) In general**

**(i) Required information**

An application submitted under this subsection shall include information demonstrating that—

(I) the biological product is biosimilar to a reference product based upon data derived from—

(aa) analytical studies that demonstrate that the biological product is highly similar to the reference product notwithstanding minor differences in clinically inactive components;

(bb) animal studies (including the assessment of toxicity); and

(cc) a clinical study or studies (including the assessment of immunogenicity and pharmacokinetics or pharmacodynamics) that are sufficient to demonstrate safety, purity, and potency in 1 or more appropriate conditions of use for which the reference product is licensed and intended

to be used and for which licensure is sought for the biological product;

(II) the biological product and reference product utilize the same mechanism or mechanisms of action for the condition or conditions of use prescribed, recommended, or suggested in the proposed labeling, but only to the extent the mechanism or mechanisms of action are known for the reference product;

(III) the condition or conditions of use prescribed, recommended, or suggested in the labeling proposed for the biological product have been previously approved for the reference product;

(IV) the route of administration, the dosage form, and the strength of the biological product are the same as those of the reference product; and

(V) the facility in which the biological product is manufactured, processed, packed, or held meets standards designed to assure that the biological product continues to be safe, pure, and potent.

**(ii) Determination by Secretary**

The Secretary may determine, in the Secretary's discretion, that an element described in clause (i)(I) is unnecessary in an application submitted under this subsection.

**(iii) Additional information**

An application submitted under this subsection—

(I) shall include publicly-available information regarding the Secretary's previous determination that the reference product is safe, pure, and potent; and

(II) may include any additional information in support of the application, including publicly-available information with respect to the reference product or another biological product.

**(B) Interchangeability**

An application (or a supplement to an application) submitted under this subsection may include information demonstrating that the biological product meets the standards described in paragraph (4).

**(3) Evaluation by Secretary**

Upon review of an application (or a supplement to an application) submitted under this subsection, the Secretary shall license the biological product under this subsection if—

(A) the Secretary determines that the information submitted in the application (or the supplement) is sufficient to show that the biological product—

(i) is biosimilar to the reference product; or

(ii) meets the standards described in paragraph (4), and therefore is interchangeable with the reference product; and

(B) the applicant (or other appropriate person) consents to the inspection of the facility that is the subject of the application, in accordance with subsection (c).

**(4) Safety standards for determining interchangeability**

Upon review of an application submitted under this subsection or any supplement to such application, the Secretary shall determine the biological product to be interchangeable with the reference product if the Secretary determines that the information submitted in the application (or a supplement to such application) is sufficient to show that—

(A) the biological product—

(i) is biosimilar to the reference product; and

(ii) can be expected to produce the same clinical result as the reference product in any given patient; and

(B) for a biological product that is administered more than once to an individual, the risk in terms of safety or diminished efficacy of alternating or switching between use of the biological product and the reference product is not greater than the risk of using the reference product without such alternation or switch.

**(5) General rules**

**(A) One reference product per application**

A biological product, in an application submitted under this subsection, may not be evaluated against more than 1 reference product.

**(B) Review**

An application submitted under this subsection shall be reviewed by the division within the Food and Drug Administration that is responsible for the review and approval of the application under which the reference product is licensed.

**(C) Risk evaluation and mitigation strategies**

The authority of the Secretary with respect to risk evaluation and mitigation strategies under the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.] shall apply to biological products licensed under this subsection in the same manner as such authority applies to biological products licensed under subsection (a).

**(6) Exclusivity for first interchangeable biological product**

Upon review of an application submitted under this subsection relying on the same reference product for which a prior biological product has received a determination of interchangeability for any condition of use, the Secretary shall not make a determination under paragraph (4) that the second or subsequent biological product is interchangeable for any condition of use until the earlier of—

(A) 1 year after the first commercial marketing of the first interchangeable biosimilar biological product to be approved as interchangeable for that reference product;

(B) 18 months after—

(i) a final court decision on all patents in suit in an action instituted under subsection (*l*)(6) against the applicant that submitted the application for the first approved interchangeable biosimilar biological product; or

(ii) the dismissal with or without prejudice of an action instituted under subsection (*l*)(6) against the applicant that submitted the application for the first approved interchangeable biosimilar biological product; or

(C)(i) 42 months after approval of the first interchangeable biosimilar biological product if the applicant that submitted such application has been sued under subsection (*l*)(6) and such litigation is still ongoing within such 42-month period; or

(ii) 18 months after approval of the first interchangeable biosimilar biological product if the applicant that submitted such application has not been sued under subsection (*l*)(6).

For purposes of this paragraph, the term "final court decision" means a final decision of a court from which no appeal (other than a petition to the United States Supreme Court for a writ of certiorari) has been or can be taken.

**(7) Exclusivity for reference product**

**(A) Effective date of biosimilar application approval**

Approval of an application under this subsection may not be made effective by the Secretary until the date that is 12 years after the date on which the reference product was first licensed under subsection (a).

**(B) Filing period**

An application under this subsection may not be submitted to the Secretary until the date that is 4 years after the date on which the reference product was first licensed under subsection (a).

**(C) First licensure**

Subparagraphs (A) and (B) shall not apply to a license for or approval of—

(i) a supplement for the biological product that is the reference product; or

(ii) a subsequent application filed by the same sponsor or manufacturer of the biological product that is the reference product (or a licensor, predecessor in interest, or other related entity) for—

(I) a change (not including a modification to the structure of the biological product) that results in a new indication, route of administration, dosing schedule, dosage form, delivery system, delivery device, or strength; or

(II) a modification to the structure of the biological product that does not result in a change in safety, purity, or potency.

**(8) Guidance documents**

**(A) In general**

The Secretary may, after opportunity for public comment, issue guidance in accordance, except as provided in subparagraph (B)(i), with section 701(h) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 371(h)] with respect to the licensure of a biological product under this subsection. Any such guidance may be general or specific.

**(B) Public comment**

**(i) In general**

The Secretary shall provide the public an opportunity to comment on any proposed guidance issued under subparagraph (A) before issuing final guidance.

**(ii) Input regarding most valuable guidance**

The Secretary shall establish a process through which the public may provide the Secretary with input regarding priorities for issuing guidance.

**(C) No requirement for application consideration**

The issuance (or non-issuance) of guidance under subparagraph (A) shall not preclude the review of, or action on, an application submitted under this subsection.

**(D) Requirement for product class-specific guidance**

If the Secretary issues product class-specific guidance under subparagraph (A), such guidance shall include a description of—

(i) the criteria that the Secretary will use to determine whether a biological product is highly similar to a reference product in such product class; and

(ii) the criteria, if available, that the Secretary will use to determine whether a biological product meets the standards described in paragraph (4).

**(E) Certain product classes**

**(i) Guidance**

The Secretary may indicate in a guidance document that the science and experience, as of the date of such guidance, with respect to a product or product class (not including any recombinant protein) does not allow approval of an application for a license as provided under this subsection for such product or product class.

**(ii) Modification or reversal**

The Secretary may issue a subsequent guidance document under subparagraph (A) to modify or reverse a guidance document under clause (i).

**(iii) No effect on ability to deny license**

Clause (i) shall not be construed to require the Secretary to approve a product with respect to which the Secretary has not indicated in a guidance document that the science and experience, as described in clause (i), does not allow approval of such an application.

**(*l*) Patents**

**(1) Confidential access to subsection (k) application**

**(A) Application of paragraph**

Unless otherwise agreed to by a person that submits an application under subsection (k) (referred to in this subsection as the "subsection (k) applicant") and the sponsor of the application for the reference product (referred to in this subsection as the "reference product sponsor"), the provisions

of this paragraph shall apply to the exchange of information described in this subsection.

**(B) In general**

**(i) Provision of confidential information**

When a subsection (k) applicant submits an application under subsection (k), such applicant shall provide to the persons described in clause (ii), subject to the terms of this paragraph, confidential access to the information required to be produced pursuant to paragraph (2) and any other information that the subsection (k) applicant determines, in its sole discretion, to be appropriate (referred to in this subsection as the "confidential information").

**(ii) Recipients of information**

The persons described in this clause are the following:

**(I) Outside counsel**

One or more attorneys designated by the reference product sponsor who are employees of an entity other than the reference product sponsor (referred to in this paragraph as the "outside counsel"), provided that such attorneys do not engage, formally or informally, in patent prosecution relevant or related to the reference product.

**(II) In-house counsel**

One attorney that represents the reference product sponsor who is an employee of the reference product sponsor, provided that such attorney does not engage, formally or informally, in patent prosecution relevant or related to the reference product.

**(iii) Patent owner access**

A representative of the owner of a patent exclusively licensed to a reference product sponsor with respect to the reference product and who has retained a right to assert the patent or participate in litigation concerning the patent may be provided the confidential information, provided that the representative informs the reference product sponsor and the subsection (k) applicant of his or her agreement to be subject to the confidentiality provisions set forth in this paragraph, including those under clause (ii).

**(C) Limitation on disclosure**

No person that receives confidential information pursuant to subparagraph (B) shall disclose any confidential information to any other person or entity, including the reference product sponsor employees, outside scientific consultants, or other outside counsel retained by the reference product sponsor, without the prior written consent of the subsection (k) applicant, which shall not be unreasonably withheld.

**(D) Use of confidential information**

Confidential information shall be used for the sole and exclusive purpose of determining, with respect to each patent assigned to

or exclusively licensed by the reference product sponsor, whether a claim of patent infringement could reasonably be asserted if the subsection (k) applicant engaged in the manufacture, use, offering for sale, sale, or importation into the United States of the biological product that is the subject of the application under subsection (k).

**(E) Ownership of confidential information**

The confidential information disclosed under this paragraph is, and shall remain, the property of the subsection (k) applicant. By providing the confidential information pursuant to this paragraph, the subsection (k) applicant does not provide the reference product sponsor or the outside counsel any interest in or license to use the confidential information, for purposes other than those specified in subparagraph (D).

**(F) Effect of infringement action**

In the event that the reference product sponsor files a patent infringement suit, the use of confidential information shall continue to be governed by the terms of this paragraph until such time as a court enters a protective order regarding the information. Upon entry of such order, the subsection (k) applicant may redesignate confidential information in accordance with the terms of that order. No confidential information shall be included in any publicly-available complaint or other pleading. In the event that the reference product sponsor does not file an infringement action by the date specified in paragraph (6), the reference product sponsor shall return or destroy all confidential information received under this paragraph, provided that if the reference product sponsor opts to destroy such information, it will confirm destruction in writing to the subsection (k) applicant.

**(G) Rule of construction**

Nothing in this paragraph shall be construed—

(i) as an admission by the subsection (k) applicant regarding the validity, enforceability, or infringement of any patent; or

(ii) as an agreement or admission by the subsection (k) applicant with respect to the competency, relevance, or materiality of any confidential information.

**(H) Effect of violation**

The disclosure of any confidential information in violation of this paragraph shall be deemed to cause the subsection (k) applicant to suffer irreparable harm for which there is no adequate legal remedy and the court shall consider immediate injunctive relief to be an appropriate and necessary remedy for any violation or threatened violation of this paragraph.

**(2) Subsection (k) application information**

Not later than 20 days after the Secretary notifies the subsection (k) applicant that the application has been accepted for review, the subsection (k) applicant—

(A) shall provide to the reference product sponsor a copy of the application submitted

to the Secretary under subsection (k), and such other information that describes the process or processes used to manufacture the biological product that is the subject of such application; and

(B) may provide to the reference product sponsor additional information requested by or on behalf of the reference product sponsor.

**(3) List and description of patents**

**(A) List by reference product sponsor**

Not later than 60 days after the receipt of the application and information under paragraph (2), the reference product sponsor shall provide to the subsection (k) applicant—

(i) a list of patents for which the reference product sponsor believes a claim of patent infringement could reasonably be asserted by the reference product sponsor, or by a patent owner that has granted an exclusive license to the reference product sponsor with respect to the reference product, if a person not licensed by the reference product sponsor engaged in the making, using, offering to sell, selling, or importing into the United States of the biological product that is the subject of the subsection (k) application; and

(ii) an identification of the patents on such list that the reference product sponsor would be prepared to license to the subsection (k) applicant.

**(B) List and description by subsection (k) applicant**

Not later than 60 days after receipt of the list under subparagraph (A), the subsection (k) applicant—

(i) may provide to the reference product sponsor a list of patents to which the subsection (k) applicant believes a claim of patent infringement could reasonably be asserted by the reference product sponsor if a person not licensed by the reference product sponsor engaged in the making, using, offering to sell, selling, or importing into the United States of the biological product that is the subject of the subsection (k) application;

(ii) shall provide to the reference product sponsor, with respect to each patent listed by the reference product sponsor under subparagraph (A) or listed by the subsection (k) applicant under clause (i)—

(I) a detailed statement that describes, on a claim by claim basis, the factual and legal basis of the opinion of the subsection (k) applicant that such patent is invalid, unenforceable, or will not be infringed by the commercial marketing of the biological product that is the subject of the subsection (k) application; or

(II) a statement that the subsection (k) applicant does not intend to begin commercial marketing of the biological product before the date that such patent expires; and

(iii) shall provide to the reference product sponsor a response regarding each patent identified by the reference product sponsor under subparagraph (A)(ii).

**(C) Description by reference product sponsor**

Not later than 60 days after receipt of the list and statement under subparagraph (B), the reference product sponsor shall provide to the subsection (k) applicant a detailed statement that describes, with respect to each patent described in subparagraph (B)(ii)(I), on a claim by claim basis, the factual and legal basis of the opinion of the reference product sponsor that such patent will be infringed by the commercial marketing of the biological product that is the subject of the subsection (k) application and a response to the statement concerning validity and enforceability provided under subparagraph (B)(ii)(I).

**(4) Patent resolution negotiations**

**(A) In general**

After receipt by the subsection (k) applicant of the statement under paragraph (3)(C), the reference product sponsor and the subsection (k) applicant shall engage in good faith negotiations to agree on which, if any, patents listed under paragraph (3) by the subsection (k) applicant or the reference product sponsor shall be the subject of an action for patent infringement under paragraph (6).

**(B) Failure to reach agreement**

If, within 15 days of beginning negotiations under subparagraph (A), the subsection (k) applicant and the reference product sponsor fail to agree on a final and complete list of which, if any, patents listed under paragraph (3) by the subsection (k) applicant or the reference product sponsor shall be the subject of an action for patent infringement under paragraph (6), the provisions of paragraph (5) shall apply to the parties.

**(5) Patent resolution if no agreement**

**(A) Number of patents**

The subsection (k) applicant shall notify the reference product sponsor of the number of patents that such applicant will provide to the reference product sponsor under subparagraph (B)(i)(I).

**(B) Exchange of patent lists**

**(i) In general**

On a date agreed to by the subsection (k) applicant and the reference product sponsor, but in no case later than 5 days after the subsection (k) applicant notifies the reference product sponsor under subparagraph (A), the subsection (k) applicant and the reference product sponsor shall simultaneously exchange—

(I) the list of patents that the subsection (k) applicant believes should be the subject of an action for patent infringement under paragraph (6); and

(II) the list of patents, in accordance with clause (ii), that the reference product sponsor believes should be the subject of an action for patent infringement under paragraph (6).

**(ii) Number of patents listed by reference product sponsor**

**(I) In general**

Subject to subclause (II), the number of patents listed by the reference product sponsor under clause (i)(II) may not exceed the number of patents listed by the subsection (k) applicant under clause (i)(I).

**(II) Exception**

If a subsection (k) applicant does not list any patent under clause (i)(I), the reference product sponsor may list 1 patent under clause (i)(II).

**(6) Immediate patent infringement action**

**(A) Action if agreement on patent list**

If the subsection (k) applicant and the reference product sponsor agree on patents as described in paragraph (4), not later than 30 days after such agreement, the reference product sponsor shall bring an action for patent infringement with respect to each such patent.

**(B) Action if no agreement on patent list**

If the provisions of paragraph (5) apply to the parties as described in paragraph (4)(B), not later than 30 days after the exchange of lists under paragraph (5)(B), the reference product sponsor shall bring an action for patent infringement with respect to each patent that is included on such lists.

**(C) Notification and publication of complaint**

**(i) Notification to Secretary**

Not later than 30 days after a complaint is served to a subsection (k) applicant in an action for patent infringement described under this paragraph, the subsection (k) applicant shall provide the Secretary with notice and a copy of such complaint.

**(ii) Publication by Secretary**

The Secretary shall publish in the Federal Register notice of a complaint received under clause (i).

**(7) Newly issued or licensed patents**

In the case of a patent that—

(A) is issued to, or exclusively licensed by, the reference product sponsor after the date that the reference product sponsor provided the list to the subsection (k) applicant under paragraph (3)(A); and

(B) the reference product sponsor reasonably believes that, due to the issuance of such patent, a claim of patent infringement could reasonably be asserted by the reference product sponsor if a person not licensed by the reference product sponsor engaged in the making, using, offering to sell, selling, or importing into the United States of the biological product that is the subject of the subsection (k) application,

not later than 30 days after such issuance or licensing, the reference product sponsor shall provide to the subsection (k) applicant a supplement to the list provided by the reference product sponsor under paragraph (3)(A) that includes such patent, not later than 30 days after such supplement is provided, the subsection (k) applicant shall provide a statement to the reference product sponsor in accordance with paragraph (3)(B), and such patent shall be subject to paragraph (8).

**(8) Notice of commercial marketing and preliminary injunction**

**(A) Notice of commercial marketing**

The subsection (k) applicant shall provide notice to the reference product sponsor not later than 180 days before the date of the first commercial marketing of the biological product licensed under subsection (k).

**(B) Preliminary injunction**

After receiving the notice under subparagraph (A) and before such date of the first commercial marketing of such biological product, the reference product sponsor may seek a preliminary injunction prohibiting the subsection (k) applicant from engaging in the commercial manufacture or sale of such biological product until the court decides the issue of patent validity, enforcement, and infringement with respect to any patent that is—

(i) included in the list provided by the reference product sponsor under paragraph (3)(A) or in the list provided by the subsection (k) applicant under paragraph (3)(B); and

(ii) not included, as applicable, on—

(I) the list of patents described in paragraph (4); or

(II) the lists of patents described in paragraph (5)(B).

**(C) Reasonable cooperation**

If the reference product sponsor has sought a preliminary injunction under subparagraph (B), the reference product sponsor and the subsection (k) applicant shall reasonably cooperate to expedite such further discovery as is needed in connection with the preliminary injunction motion.

**(9) Limitation on declaratory judgment action**

**(A) Subsection (k) application provided**

If a subsection (k) applicant provides the application and information required under paragraph (2)(A), neither the reference product sponsor nor the subsection (k) applicant may, prior to the date notice is received under paragraph (8)(A), bring any action under section 2201 of title 28 for a declaration of infringement, validity, or enforceability of any patent that is described in clauses (i) and (ii) of paragraph (8)(B).

**(B) Subsequent failure to act by subsection (k) applicant**

If a subsection (k) applicant fails to complete an action required of the subsection (k) applicant under paragraph (3)(B)(ii), paragraph (5), paragraph (6)(C)(i), paragraph (7), or paragraph (8)(A), the reference product sponsor, but not the subsection (k) applicant, may bring an action under section 2201 of title 28 for a declaration of infringement,

validity, or enforceability of any patent included in the list described in paragraph (3)(A), including as provided under paragraph (7).

**(C) Subsection (k) application not provided**

If a subsection (k) applicant fails to provide the application and information required under paragraph (2)(A), the reference product sponsor, but not the subsection (k) applicant, may bring an action under section 2201 of title 28 for a declaration of infringement, validity, or enforceability of any patent that claims the biological product or a use of the biological product.

**(m) Pediatric studies**

**(1) Application of certain provisions**

The provisions of subsections (a), (d), (e), (f), (i), (j), (k), (*l*), (p), and (q) of section 505A of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355a(a), (d), (e), (f), (i), (j), (k), (*l*), (p), (q)] shall apply with respect to the extension of a period under paragraphs (2) and (3) to the same extent and in the same manner as such provisions apply with respect to the extension of a period under subsection (b) or (c) of section 505A of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355a(b), (c)].

**(2) Market exclusivity for new biological products**

If, prior to approval of an application that is submitted under subsection (a), the Secretary determines that information relating to the use of a new biological product in the pediatric population may produce health benefits in that population, the Secretary makes a written request for pediatric studies (which shall include a timeframe for completing such studies), the applicant agrees to the request, such studies are completed using appropriate formulations for each age group for which the study is requested within any such timeframe, and the reports thereof are submitted and accepted in accordance with section 505A(d)(3) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355a(d)(3)]—

(A) the periods for such biological product referred to in subsection (k)(7) are deemed to be 4 years and 6 months rather than 4 years and 12 years and 6 months rather than 12 years; and

(B) if the biological product is designated under section 526[1] [21 U.S.C. 360bb] for a rare disease or condition, the period for such biological product referred to in section 527(a)[1] [21 U.S.C. 360cc(a)] is deemed to be 7 years and 6 months rather than 7 years.

**(3) Market exclusivity for already-marketed biological products**

If the Secretary determines that information relating to the use of a licensed biological product in the pediatric population may produce health benefits in that population and makes a written request to the holder of an approved application under subsection (a) for pediatric studies (which shall include a timeframe for completing such studies), the holder agrees to the request, such studies are completed using appropriate formulations for each age group for which the study is requested within any such timeframe, and the reports thereof are submitted and accepted in accordance with section 505A(d)(3) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355a(d)(3)]—

(A) the periods for such biological product referred to in subsection (k)(7) are deemed to be 4 years and 6 months rather than 4 years and 12 years and 6 months rather than 12 years; and

(B) if the biological product is designated under section 526[1] [21 U.S.C. 360bb] for a rare disease or condition, the period for such biological product referred to in section 527(a)[1] [21 U.S.C. 360cc(a)] is deemed to be 7 years and 6 months rather than 7 years.

**(4) Exception**

The Secretary shall not extend a period referred to in paragraph (2)(A), (2)(B), (3)(A), or (3)(B) if the determination under section 505A(d)(3)[1] [21 U.S.C. 355a(d)(3)] is made later than 9 months prior to the expiration of such period.

(July 1, 1944, ch. 373, title III, §351, 58 Stat. 702; 1953 Reorg. Plan No. 1, §§5, 8, eff. Apr. 11, 1953, 18 F.R. 2053, 67 Stat. 631; Pub. L. 85–881, §2, Sept. 2, 1958, 72 Stat. 1704; Pub. L. 91–515, title II, §291, Oct. 30, 1970, 84 Stat. 1308; Pub. L. 96–88, title V, §509(b), Oct. 17, 1979, 93 Stat. 695; Pub. L. 99–660, title I, §105(a), title III, §315, Nov. 14, 1986, 100 Stat. 3751, 3783; Pub. L. 102–300, §6(b)(1), June 16, 1992, 106 Stat. 240; Pub. L. 104–134, title II, §§2102(d)(2), 2104, Apr. 26, 1996, 110 Stat. 1321–319, 1321–320; Pub. L. 105–115, title I, §123(a)–(d), (g), Nov. 21, 1997, 111 Stat. 2323, 2324; Pub. L. 108–155, §2(b)(3), Dec. 3, 2003, 117 Stat. 1941; Pub. L. 110–85, title IX, §901(c), Sept. 27, 2007, 121 Stat. 939; Pub. L. 111–148, title VII, §7002(a), (b), (g)(1), Mar. 23, 2010, 124 Stat. 804, 814, 819.)

REFERENCES IN TEXT

The effective date of this paragraph, referred to in subsec. (d)(2), is the effective date of section 315 of Pub. L. 99–660 which added subsec. (d)(2). See Effective Date of 1986 Amendment note set out below.

The Federal Food, Drug, and Cosmetic Act, referred to in subsecs. (g), (h), (j), and (k)(5)(C), is act June 25, 1938, ch. 675, 52 Stat. 1040, which is classified generally to chapter 9 (§301 et seq.) of Title 21, Food and Drugs. For complete classification of this Act to the Code, see section 301 of Title 21 and Tables.

Sections 526, 527(a), and 505A(d)(3), referred to in subsec. (m)(2)(B), (3)(B), (4), probably mean sections 526, 527(a), and 505A(d)(3) of the Federal Food, Drug, and Cosmetic Act, act June 25, 1938, ch. 675, which are classified to sections 360bb, 360cc(a), and 355a(d)(3), respectively, of Title 21, Food and Drugs.

AMENDMENTS

2010—Subsec. (a)(1)(A). Pub. L. 111–148, §7002(a)(1), inserted "under this subsection or subsection (k)" after "biologics license".

Subsec. (i). Pub. L. 111–148, §7002(b), substituted "In this section;" for "In this section,", designated remainder of existing provisions as par. (1), substituted "The term" for "the term", inserted "protein (except any chemically synthesized polypeptide)," after "allergenic product,", and added pars. (2) to (4).

Subsecs. (k), (*l*). Pub. L. 111–148, §7002(a)(2), added subsecs. (k) and (*l*).

[1] See References in Text note below.

Subsec. (m). Pub. L. 111–148, § 7002(g)(1), added subsec. (m).

2007—Subsec. (a)(2)(D). Pub. L. 110–85, § 901(c)(1), added subpar. (D).

Subsec. (j). Pub. L. 110–85, § 901(c)(2), inserted '', including the requirements under sections 505(o), 505(p), and 505–1 of such Act,'' after ''and Cosmetic Act''.

2003—Subsec. (a)(2)(B), (C). Pub. L. 108–155 added subpar. (B) and redesignated former subpar. (B) as (C).

1997—Subsec. (a). Pub. L. 105–115, § 123(a)(1), amended subsec. (a) generally. Prior to amendment, subsec. (a) related to intrastate and interstate traffic in biological products and suspension or revocation of licenses as affecting prior sales.

Subsec. (b). Pub. L. 105–115, § 123(b), amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: ''No person shall falsely label or mark any package or container of any virus, serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or other product aforesaid; nor alter any label or mark on any package or container of any virus, serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or other product aforesaid so as to falsify such label or mark.''

Subsec. (c). Pub. L. 105–115, § 123(c), substituted ''biological product.'' for ''virus, serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or other product aforesaid for sale, barter, or exchange in the District of Columbia, or to be sent, carried, or brought from any State or possession into any other State or possession or into any foreign country, or from any foreign country into any State or possession.''

Subsec. (d). Pub. L. 105–115, § 123(a)(2), designated par. (2) as subsec. (d), redesignated subpars. (A) and (B) of par. (2) as pars. (1) and (2), respectively, in par. (2), substituted ''Any violation of paragraph (1)'' for ''Any violation of subparagraph (A)'' and substituted ''this paragraph'' for ''this subparagraph'' wherever appearing, and struck out former par. (1) which read as follows: ''Licenses for the maintenance of establishments for the propagation or manufacture and preparation of products described in subsection (a) of this section may be issued only upon a showing that the establishment and the products for which a license is desired meet standards, designed to insure the continued safety, purity, and potency of such products, prescribed in regulations, and licenses for new products may be issued only upon a showing that they meet such standards. All such licenses shall be issued, suspended, and revoked as prescribed by regulations and all licenses issued for the maintenance of establishments for the propagation or manufacture and preparation, in any foreign country, of any such products for sale, barter, or exchange in any State or possession shall be issued upon condition that the licensees will permit the inspection of their establishments in accordance with subsection (c) of this section.''

Subsec. (i). Pub. L. 105–115, § 123(d), added subsec. (i).

Subsec. (j). Pub. L. 105–115, § 123(g), added subsec. (j).

1996—Subsec. (h). Pub. L. 104–134, § 2104, amended subsec. (h) generally, revising and restating former provisions, which also related to exportation of partially processed biological products.

Subsec. (h)(1)(A). Pub. L. 104–134, § 2102(d)(2), substituted ''in a country listed under section 802(b)(1)'' for ''in a country listed under section 802(b)(A)'' and ''to a country listed under section 802(b)(1)'' for ''to a country listed under section 802(b)(4)''.

1992—Subsec. (c). Pub. L. 102–300, which directed substitution of ''Health and Human Services'' for ''Health, Education, and Welfare'', could not be executed because the words ''Health, Education, and Welfare'' did not appear in original statutory text. Previously, references to Department and Secretary of Health and Human Services were substituted for references to Federal Security Agency and its Administrator pursuant to provisions cited in Transfer of Functions note below.

1986—Subsec. (d). Pub. L. 99–660, § 315, designated existing provisions as par. (1) and added par. (2).

Subsec. (h). Pub. L. 99–660, § 105(a), added subsec. (h).

1970—Subsecs. (a) to (c). Pub. L. 91–515 inserted ''vaccine, blood, blood component or derivative, allergenic product,'' after ''antitoxin'' wherever appearing.

1958—Subsec. (d). Pub. L. 85–881 struck out ''made jointly by the Surgeon General, the Surgeon General of the Army, and the Surgeon General of the Navy, and approved by the Secretary'' after ''regulations'' in first sentence.

EFFECTIVE DATE OF 2007 AMENDMENT

Amendment by Pub. L. 110–85 effective 180 days after Sept. 27, 2007, see section 909 of Pub. L. 110–85, set out as a note under section 331 of Title 21, Food and Drugs.

EFFECTIVE DATE OF 2003 AMENDMENT

Amendment by Pub. L. 108–155 effective Dec. 3, 2003, except as otherwise provided, see section 4 of Pub. L. 108–155, set out as an Effective Date note under section 355c of Title 21, Food and Drugs.

EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105–115 effective 90 days after Nov. 21, 1997, except as otherwise provided, see section 501 of Pub. L. 105–115, set out as a note under section 321 of Title 21, Food and Drugs.

EFFECTIVE DATE OF 1986 AMENDMENT

Section 105(b) of Pub. L. 99–660 provided that: ''Paragraph (1) of section 351(h) of the Public Health Service Act [former subsec. (h)(1) of this section] as added by subsection (a) shall take effect upon the expiration of 90 days after the date of the enactment of this Act [Nov. 14, 1986].''

Amendment by section 315 of Pub. L. 99–660 effective Dec. 22, 1987, see section 323 of Pub. L. 99–660, as amended, set out as an Effective Date note under section 300aa–1 of this title.

TRANSFER OF FUNCTIONS

Functions of Public Health Service, Surgeon General of Public Health Service, and all other officers and employees of Public Health Service, and functions of all agencies of or in Public Health Service transferred to Secretary of Health, Education, and Welfare by Reorg. Plan No. 3 of 1966, eff. June 25, 1966, 31 F.R. 8855, 80 Stat. 1610, set out as a note under section 202 of this title. Secretary of Health, Education, and Welfare redesignated Secretary of Health and Human Services by section 509(b) of Pub. L. 96–88 which is classified to section 3508(b) of Title 20, Education.

References to Secretary and Department of Health, Education, and Welfare substituted for references to Federal Security Administrator and Federal Security Agency, respectively, pursuant to Reorg. Plan No. 1 of 1953, § 5, set out as a note under section 3501 of this title, which transferred all functions of Federal Security Administrator to Secretary of Health, Education, and Welfare and all agencies of Federal Security Agency to Department of Health, Education, and Welfare. Federal Security Agency and office of Administrator abolished by section 8 of Reorg. Plan No. 1 of 1953. Secretary and Department of Health, Education, and Welfare redesignated Secretary and Department of Health and Human Services by section 509(b) of Pub. L. 96–88 which is classified to section 3508(b) of Title 20.

PRODUCTS PREVIOUSLY APPROVED UNDER THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

Pub. L. 111–148, title VII, § 7002(e), Mar. 23, 2010, 124 Stat. 817, provided that:

''(1) REQUIREMENT TO FOLLOW SECTION 351.—Except as provided in paragraph (2), an application for a biological product shall be submitted under section 351 of the Public Health Service Act (42 U.S.C. 262) (as amended by this Act).

''(2) EXCEPTION.—An application for a biological product may be submitted under section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355) if—

''(A) such biological product is in a product class for which a biological product in such product class is the subject of an application approved under such section 505 not later than the date of enactment of this Act [Mar. 23, 2010]; and

''(B) such application—

''(i) has been submitted to the Secretary of Health and Human Services (referred to in this subtitle [subtitle A (§§7001–7003) of title VII of Pub. L. 111–148, see Short Title of 2010 Amendment note under section 201 of this title] as the 'Secretary') before the date of enactment of this Act; or

''(ii) is submitted to the Secretary not later than the date that is 10 years after the date of enactment of this Act.

''(3) LIMITATION.—Notwithstanding paragraph (2), an application for a biological product may not be submitted under section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355) if there is another biological product approved under subsection (a) of section 351 of the Public Health Service Act [42 U.S.C. 262] that could be a reference product with respect to such application (within the meaning of such section 351) if such application were submitted under subsection (k) of such section 351.

''(4) DEEMED APPROVED UNDER SECTION 351.—An approved application for a biological product under section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355) shall be deemed to be a license for the biological product under such section 351 on the date that is 10 years after the date of enactment of this Act.

''(5) DEFINITIONS.—For purposes of this subsection, the term 'biological product' has the meaning given such term under section 351 of the Public Health Service Act (42 U.S.C. 262) (as amended by this Act).''

COSTS OF REVIEWING BIOSIMILAR BIOLOGICAL PRODUCT APPLICATIONS

Pub. L. 111–148, title VII, §7002(f)(3)(B), (C), Mar. 23, 2010, 124 Stat. 818, 819, provided that:

''(B) EVALUATION OF COSTS OF REVIEWING BIOSIMILAR BIOLOGICAL PRODUCT APPLICATIONS.—During the period beginning on the date of enactment of this Act [Mar. 23, 2010] and ending on October 1, 2010, the Secretary [of Health and Human Services] shall collect and evaluate data regarding the costs of reviewing applications for biological products submitted under section 351(k) of the Public Health Service Act [42 U.S.C. 262(k)] (as added by this Act) during such period.

''(C) AUDIT.—

''(i) IN GENERAL.—On the date that is 2 years after first receiving a user fee applicable to an application for a biological product under section 351(k) of the Public Health Service Act [42 U.S.C. 262(k)] (as added by this Act), and on a biennial basis thereafter until October 1, 2013, the Secretary shall perform an audit of the costs of reviewing such applications under such section 351(k). Such an audit shall compare—

''(I) the costs of reviewing such applications under such section 351(k) to the amount of the user fee applicable to such applications; and

''(II)(aa) such ratio determined under subclause (I); to

''(bb) the ratio of the costs of reviewing applications for biological products under section 351(a) of such Act [42 U.S.C. 262(a)] (as amended by this Act) to the amount of the user fee applicable to such applications under section 351(a).

''(ii) ALTERATION OF USER FEE.—If the audit performed under clause (i) indicates that the ratios compared under subclause (II) of such clause differ by more than 5 percent, then the Secretary shall alter the user fee applicable to applications submitted under such section 351(k) [42 U.S.C. 262(k)] to more appropriately account for the costs of reviewing such applications.

''(iii) ACCOUNTING STANDARDS.—The Secretary shall perform an audit under clause (i) in conformance with the accounting principles, standards, and requirements prescribed by the Comptroller General of the United States under section 3511 of title 31, United States Code, to ensure the validity of any potential variability.''

LICENSING OF ORPHAN PRODUCTS

Pub. L. 111–148, title VII, §7002(h), Mar. 23, 2010, 124 Stat. 821, provided that: ''If a reference product, as defined in section 351 of the Public Health Service Act (42 U.S.C. 262) (as amended by this Act) has been designated under section 526 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bb) for a rare disease or condition, a biological product seeking approval for such disease or condition under subsection (k) of such section 351 as biosimilar to, or interchangeable with, such reference product may be licensed by the Secretary [of Health and Human Services] only after the expiration for such reference product of the later of—

''(1) the 7-year period described in section 527(a) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360cc(a)); and

''(2) the 12-year period described in subsection (k)(7) of such section 351.''

SAVINGS GENERATED BY 2010 AMENDMENT

Pub. L. 111–148, title V, §7003, Mar. 23, 2010, 124 Stat. 821, provided that:

''(a) DETERMINATION.—The Secretary of the Treasury, in consultation with the Secretary of Health and Human Services, shall for each fiscal year determine the amount of savings to the Federal Government as a result of the enactment of this subtitle [subtitle A (§§7001–7003) of title VII of Pub. L. 111–148, see Short Title of 2010 Amendment note under section 201 of this title].

''(b) USE.—Notwithstanding any other provision of this subtitle (or an amendment made by this subtitle), the savings to the Federal Government generated as a result of the enactment of this subtitle shall be used for deficit reduction.''

ENHANCED PENALTIES AND CONTROL OF BIOLOGICAL AGENTS

Pub. L. 104–132, title V, §511, Apr. 24, 1996, 110 Stat. 1284, as amended by Pub. L. 107–188, title II, §204, June 12, 2002, 116 Stat. 647, provided that:

''(a) FINDINGS.—The Congress finds that—

''(1) certain biological agents have the potential to pose a severe threat to public health and safety;

''(2) such biological agents can be used as weapons by individuals or organizations for the purpose of domestic or international terrorism or for other criminal purposes;

''(3) the transfer and possession of potentially hazardous biological agents should be regulated to protect public health and safety; and

''(4) efforts to protect the public from exposure to such agents should ensure that individuals and groups with legitimate objectives continue to have access to such agents for clinical and research purposes.

''(b) CRIMINAL ENFORCEMENT.—[Amended sections 175, 177, and 178 of Title 18, Crimes and Criminal Procedure.]

''(c) TERRORISM.—[Amended section 2332a of Title 18.]''

## § 262a. Enhanced control of dangerous biological agents and toxins

### (a) Regulatory control of certain biological agents and toxins

#### (1) List of biological agents and toxins

##### (A) In general

The Secretary shall by regulation establish and maintain a list of each biological agent and each toxin that has the potential to pose a severe threat to public health and safety.